**TEXAS & N. O. RY. CO. v. NEW.**

No. 8260.

Court of Civil Appeals of Texas. Austin.

May 21, 1936.

Rehearing Denied June 10, 1936.

C. F. Richards, of Lockhart, Roy L. Arterbury, of Houston, and Baker, Botts, Andrews & Wharton, of Houston, for appellant.

E. B. Coopwood and Nye H. Clark, both of Lockhart, for appellee.

McCLENDON, Chief Justice.

New (appellee) recovered of the railway (appellant) a judgment upon a special issue verdict, in an action for damages for personal injuries; the amount ($2,320) being apportioned $2,000 for mental and physical pain and suffering (past and prospective), $300 for loss of earning capacity (past and prospective), and $20 ($200 found less $180 remitted) for medical bills.

New's injuries were the result of a fall from a loading box or chute, placed on a gravel car from which he was hauling gravel. The gravel car was on a storage track adjacent to a passing track, and was supported by an iron pipe extending over or so near the passing track as to be struck by trains thereon. New claimed, and the jury found, that his fall was caused by the pipe's being so struck by one of the railway's passing freight trains. The jury's findings supporting recovery were (1) discovered peril, and (2) negligence in not stopping the train after New had been ordered by the brakeman of the freight train to remove the pipe, with assurance on the brakeman's part that he would be afforded time to do so. The jury also found that New was guilty of contributory negligence in placing the pipe so as to be fouled by a passing train, but that such negligence was not the proximate cause of his injuries. The appeal is predicated upon five propositions (which we will treat also as assignments of error, as there are no assignments in the railway's brief), which urge the following points: (1) Insufficiency of the evidence to support the finding of discovered peril; (2) proximate cause as a matter of law of New's found negligence in placing the pipe so as to be fouled by a passing train; (3) insufficiency of the evidence to support the alleged promise of the brakeman to hold the train while New was removing the pipe; (4) insufficiency of the pleadings and evidence to show the brakeman's authority to bind the railway by such promise; and (5) improper argument of counsel relating to the measure of recovery for New's mental and physical pain and suffering.

The theory of the railway was that the pipe was not struck by the train. This theory it attempted to support by direct testimony to that effect by the engineer and brakeman; and by testimony of employees of the railway that the pipe, identified by them as that in issue, was not long enough to be struck by a train on the passing track. We will briefly consider this testimony. The accident occurred at Sullivan Switch, not far from Luling. There were three tracks at this point, the main line track, on the north, the passing track, next to the south, and the storage track to the extreme south. The train in question was eastbound and had orders to take the passing track to permit an extra westbound train to pass it. The passing track was reached by a switch from the main line track, a short distance east of which was another switch leading to the storage track. The gravel car was standing on the storage track, some 200 feet or more east of this latter switch. A truck which was being loaded from the gravel car was backed against the south side of that car, and the loading box was on the south side of the gravel car, and partially filled with gravel. This box was large enough to hold 1½ cubic yards of gravel, the capacity of the truck. It was so placed as to be evenly balanced on the side of the car. It was supported by a 2-inch iron pipe, which fitted into a groove in its floor, and was secured from tilting to the south by a chain fastened in some way to the car. This supporting pipe extended about 4 inches beyond the south side of the car upon which it rested, and beyond the north side of the car upon which it also rested. When the box was filled, the chain was unfastened and the box was tilted by hand so as to deposit its contents in the truck. The brakeman's version of the occurrence is given in the following excerpt from his testimony: "When we reached the switch the train came to a complete stop, and I got out and threw the switch and opened the derail. When I went down to throw the switch, I had to throw the switch from the main line to the passing track, and then there was another switch from the passing track onto this storage track, I had to throw that also as it was open to the storage track. When I opened that second switch, and threw

the derail I looked and saw this car where they were unloading the gravel, and I noticed a piece of pipe sticking out over the edge of the car which looked like it might interfere with our passing, so I hollered to a man I saw on the car to move the pipe over. I turned away, and when I looked again the pipe had disappeared, so I motioned my train to move onto the siding, and when the engine got to me I caught it, and went up on the cab and over to the fireman's side of the cab."

The engineer's version differed from that of the brakeman in one essential point, namely, as to when New fell from the box and the pipe disappeared. According to his testimony this happened after the brakeman had given the come on signal and had boarded the engine, and the latter was just about lined up on the passing track about 200 feet (he estimated) west of the gravel car. We quote from his testimony: "After we started ahead and the engine got straight on the siding, I naturally glanced down the side track to see if everything is clear. Just about the time I got the engine lined up so I could see on this side track, I saw a gravel car down the storage track about four car lengths from my engine, and I saw a man standing up on a gravel box, and this gravel box fell up endways in the car, and this man lost his balance and fell in the car. I saw that just about the time I got my engine lined up straight on this siding."

The pipe which the railway employees identified was 10 feet 2½ inches long. The following measurements were undisputed: From south rail of storage to south rail of passing track 13 feet; between the rails of each track 4 feet 8 inches; gravel car 9 feet 4 inches wide; widest cars in service 10 feet at widest point. The following calculations are deduced from these figures: The train would extend not exceeding 2 feet 8 inches south of the south rail of the passing track, and the gravel car 2 feet 4 inches north of the storage track. This would leave a clearance of not less than 3 feet 8 inches between the gravel car and widest part of the freight train. The identified pipe was only 10½ inches longer than the width of the gravel car. Allowing its conceded 4-inch projection over the south side of the car, it would only project 6½ inches north of the north side of the car, and would leave a clearance between it and the train on the passing

track of at least 3 feet 1½ inches. It seems highly improbable, with a projection of only 6½ inches beyond the gravel car, that an experienced trainman would have entertained the slightest doubt regarding the train's fouling the pipe. The conceded physical facts alone would therefore seem to eliminate the identified pipe from the picture. New and several other witnesses testified that the pipe in use was 18 feet long, and that it was flattened at the end projecting over the south side of the gravel car, whereas the pipe identified by the railway employees was not flattened at either end.

We do not think it necessary to set out in detail the testimony of New and his other witnesses as to how the accident happened. There were several of these witnesses; and while in minor details their stories do not jibe in every particular, in the main they present no irreconcilable conflicts. The evidence will support New's theory, which was substantially as follows: The box was near the east end of the car, the gravel having been unloaded from the west end up to that point. The box had been practically filled on its north side, but its south side was empty, thus throwing all the weight on the pipe, making it too heavy on the north side to be tilted by himself and two Mexican laborers who were working with him. When New discovered the train coming, he ran from his position near the track around the gravel car to determine whether the train would hit the pipe. At that time the train was slowly moving onto the switch. He then told the Mexicans to move out of the way. The brakeman, who was walking ahead of the train, then climbed on the side of the gravel car and said, "Move that pipe." New "told him he would have to wait and give me time, and he said, 'hurry up, go ahead and hurry up.'" New then got in the car and tried to tilt the box, but could not do so. He then climbed in the box and called to one of the Mexicans to get him a shovel, which was in the west end of the car. While in this position he glanced around and saw the engine against the pipe. He remembered nothing further until some minutes later when he recovered consciousness. His fall was caused by the engine's striking the pipe. One witness, who was standing near the switch on the south side of the passing track, testified that the engineer was looking ahead

in the direction of New during the time the train was moving on the passing track. We have the uncontradicted facts that both the engineer and brakeman saw New and the pipe when the engine was some 200 feet or more away; that the brakeman whose duty it was to throw the switch, see that the track was clear, and give the come on signal to the engineer, saw the projecting pipe and realized that there was at least a possibility of its being fouled by the train; and that he gave an order or command to New to remove the pipe. Those in charge of the movement of the train were fully cognizant of the situation; and we think clearly the evidence was sufficient to support every element of discovered peril. Much stress is laid by the railway upon its assertion that under New's testimony he did not get in the box, and therefore was not in a position of peril until the engine was some 12 or 15 feet away; at which time it would have been impossible to stop the train at its then speed. There are several answers to this contention. In the first place, New's testimony is not susceptible of this interpretation. In the second place, both the engineer and brakeman testified that New was in the box when the train was some 200 feet away. In the third place, the speed of the train was a controverted issue, some of the witnesses placing it at as low as 2 to 3 miles per hour. The jury were not bound by the estimate of any single eyewitness as to distances and speed, but were authorized to construct their own theory of the occurrence based upon their own belief predicated upon what they regarded the credible testimony and circumstances in evidence. It is not necessary, however, to support the judgment upon the issue of discovered peril. Negligence in not stopping the train after the brakeman told New to remove the pipe was sufficient to support liability.

■ We are also clearly of the view that proximate cause was an issuable fact, even conceding New's negligence in placing the pipe so as to be fouled by a train moving on the passing track. There are fact combinations in which proximate cause follows as a matter of law from a finding of negligence. The cases applying this doctrine are not apropos here. The gravamen of New's claim was that he would not have gotten in the box, and thus have placed himself in a position of known danger, had it not been for his reliance upon what he regarded as assurance from the brakeman that he would be given time to remove the pipe. This theory, which the jury finding supported, broke the chain of causation between New's negligent act in placing the pipe, and his injuries. This deduction we think is so plain that elaboration would be superfluous.

■ The third proposition is in substance that the pleaded case was a promise by the brakeman to hold up the train, whereas the evidence fails to establish such promise. The pleading referred to reads:

"About the time that one of the employees of the defendant in charge of said train threw the switch for said train to pass onto said switch track, the said employee of the defendant, and the engineer on said train, saw said pipe, and realizing that it would be dangerous to undertake to pass the flat car on which plaintiff was at work without removing said pipe, the employee of the defendant who had opened the switch for the train to pass upon said switch track ran ahead of said train, while the engineer moved the train up very slowly, and towards plaintiff on said flat car, and came up near to said flat car, and addressed plaintiff and ordered him to remove said pipe so that said train may pass in safety; that during this time the engineer had moved said train down the track to near where said flat car was located, and, when ordered to remove said pipe, by said employee, who plaintiff believes to be one of the brakemen, plaintiff replied to said employee of the defendant, that he (said employee of defendant) should have the train held up until plaintiff could remove the pipe and chute out of the way; that said employees of the defendant told the plaintiff to go ahead and move the pipe and chute, and that he would hold up the train, and not undertake to pass until same was removed, and assured plaintiff that the train would not undertake to pass while the plaintiff was engaged in the undertaking of the removal of said chute and pipe, and at this time the engineer was looking out of the cab window of said engine and listening to what was said.

"That relying upon the assurance of the agent and employee of the defendant that said train would be held up and would not undertake to pass while the plaintiff was so engaged in removing said box, chute and pipe, plaintiff undertook to remove said pipe and chute."

Following is the quotation from New's testimony upon which the railway relies under this proposition:

"Q. What did he (the brakeman) say? A. 'Move that pipe.'

"Q. What were his exact words? A. 'Move that G—— D—— pipe.'

"Q. What did you say to him? A. I told him he would have to wait and give me time, and he said, 'Hurry up.'"

"Q. Did he say he was going to stop? A. No, sir, but he told me to go ahead."

The pertinent issue (answered "Yes") submitted to the jury was: "Do you find from the preponderance of evidence that defendant's agents, servants or employees assured plaintiff New that the train would not pass said flat car while he was engaged in removing said pipe?"

It is elementary that it is not essential to prove every allegation, if sufficient allegations are proved to establish a case. Even taking the narrow view that to constitute a "promise" there must have been words used which expressly embodied it, the use of the expression "assurance" was sufficient to convey the idea of a promise implied from words used under the surrounding circumstances. But express language is not essential to a "promise." As defined in the Am.Law Inst.Rest. of Contracts, § 2, p. 3: "A promise is an undertaking, however expressed, either that something shall happen, or that something shall not happen in the future." And in section 21, p. 27: "The manifestation of mutual assent may be made wholly or partly by written or spoken words or by other acts or conduct."

In the "comment" under this section it is said: "Words are not the only medium of expression. Conduct may often convey as clearly as words a promise or an assent to a proposed promise."

Webster's International Dictionary gives one of the definitions of "assurance": "A declaration tending to inspire full confidence."

The quoted conversation between New and the brakeman, interpreted in the light of the surrounding circumstances, is clearly susceptible of the construction placed thereon in the pleadings. One in the situation of New approached by an operative of the train and ordered, as he was ordered, to move the pipe, which order was repeated after New said he must be given time to do so, would clearly be warranted in assuming that he would be protected from danger while complying with the order. So also the brakeman must have known, when he gave the second order after time was demanded, that compliance with the order was predicated upon reliance that such time would be given. The situation presented some of the elements, at least, of an emergency, and the words employed by the parties should be interpreted, in the light of that situation, as they would ordinarily be understood by persons so situated.

The contention that there was no pleading or proof that the brakeman had authority to bind the railway in a promise or assurance that the train would be held is untenable. The pleading above quoted describes the brakeman as "one of the employees of defendant in charge of said train." The evidence conclusively shows that it was the duty of the brakeman to line up the switches, see that the track was clear, and give the signals to the engineer to govern the movement of the train. It is said in the brief that: "It is commonly known that the conductor of the train has charge of its movements and speaks as to its stops and delays." Quite true, generally speaking. But the conductor is not ubiquitous, and manifestly from his position in the train cannot direct every act of every train operative. It would be absurd to hold that the engineer must await an order from the conductor for his every act, no matter what the emergency. Such holding would make it his duty to permit the train to be wrecked, if an obstruction appeared on the track, and there was not sufficient time to get a stop order from the conductor to prevent a collision. Each employee in the operation of a train has specific duties to perform. In the discharge of those duties he represents the railway, and his acts are the acts of the railway. That he is under the general direction and authority of the conductor does not affect his representative capacity in the proper line of his duties. The brakeman in this instance was doing what a brakeman often does, setting switches and giving signals to the engineer, and the engineer was acting upon these signals. If it was the duty of the conductor to direct these specific movements of the train, he was woefully remiss therein, for he was in a remote part of the train and knew nothing of the occurrence until he was told about it some time later.

In his closing argument to the jury, one of New's attorneys made the following statement: "Gentlemen of the Jury:

In arriving at the amount of money you shall award the plaintiff, I ask you to put yourself in his place. Give him such sum as you yourselves would want for enduring the pain and suffering that he has endured."

The trial judge qualified the railway's bill of exceptions complaining of this argument, as follows: "During the closing argument of Mr. E. B. Coopwood, one of the attorneys for the plaintiff, Mr. Roy L. Arterbury, one of the attorneys for defendant came up to the Judge's stand and in a low tone whispered to the Judge that he took exception to certain language of Mr. Coopwood. This exception was not made in the hearing of Mr. Coopwood and no request made asking the Court to withdraw such remarks from the jury, and no request made to instruct the jury to disregard the argument objected to. The Judge did not call Mr. Coopwood's attention to the objection and Mr. Coopwood did not know of the objection until after the jury had retired to consider of their verdict."

This character of argument was condemned in Brown Cracker & C. Co. v. Castle (Tex.Civ.App.) 26 S.W.(2d) 435. In dismissing an application for writ of error in that case the Supreme Court, in a per curiam opinion, expressly approved reversal upon other argument of counsel, without reference to that similar to that at bar. Castle v. Brown C. & C. Co., 119 Tex. 447, 31 S.W.(2d) 630. The holding in the Castle Case was followed in Dallas Ry. & T. Co. v. Smith (Tex.Civ.App.) 42 S.W. (2d) 794. That case does not appear to have reached the Supreme Court.

The writer experiences great difficulty in concurring in the soundness of the holding in the Castle and Smith Cases. In transmuting pain and suffering into dollars and cents, the problem of the jury is to construct an equation composed of relatively imponderable elements. The law awards compensatory damages in money for wrongfully inflicted pain and suffering; but it furnishes no yardstick or scale by which to measure or weigh such pain and suffering pecuniarily. The only standard supplied is that the damages shall be compensatory; that is, commensurate with the injury. To "compensate" is to pay the value of. To estimate the value or compensatory measure in money one must be able to visualize the intensity and duration of the pain and suffering, and then endeavor to place a fair value thereon. The former must be determined from what the jury believe the evidence supports. The argument was not directed to this issue. We hardly see how the latter, after the former has been determined, could be arrived at except by reference to one's own experience. In substance, the jury were asked to consider the issue from this viewpoint.

Without passing upon the inherent propriety of the argument, however, we have reached the conclusion that the trial court's action, under the circumstances, does not call for a reversal of the judgment. The argument did not constitute an appeal to passion or prejudice, and was not of such a character that its deleterious effect could not be removed by its withdrawal by counsel and instruction by the court not to consider it. This was the exact holding in Independent Life Ins. Co. v. Hogue (Tex.Civ. App.) 70 S.W.(2d) 629 (error dis.). Under these circumstances it was the duty, we believe, of counsel for the railway to afford to New's counsel the opportunity of withdrawal and ask for an instruction by the court that it be not considered by the jury.

The verdict of the jury was not in any sense excessive, if they believed that New was injured in the manner in which he claimed. No complaint was made of the verdict on that score. Briefly stated, the evidence will support the following findings in that regard: New was rendered unconscious for several minutes by the fall. In addition to minor bruises, he received a cut on the side of the face and a contused bruise on one cheek. He consulted a physician at Luling, who treated him for several weeks. New testified to an intense pain in the side of the face that was bruised. This physician found no objective symptoms of this pain, and advised that New consult a specialist in San Antonio, which he did. This specialist diagnosed his trouble as tic douloureux. This was described by both of these physicians as an affection of one of the facial nerves, incurable except by an operation which would result in paralysis of the side of the face and permanent injury to the eye. The symptoms of this affliction were largely, if not entirely, subjective; and the medical evidence was conflicting as to whether it was the result of the injuries received from the fall. The Luling physician testified that the medical profession generally were unable to ascribe any cause to it. A prominent physician of Lockhart testified to the contrary, that it could be caused by a blow such as New received; to which he would

ascribe it, if (as the evidence showed) he had never had the affliction before, and it followed immediately and continuously after the injury. If the jury believed, as they evidently did, the testimony of New and the specialist and Lockhart physician, we would regard $2,000 as moderate compensatory damages for New's pain and suffering, past and prospective.

The trial court's judgment is affirmed.

Affirmed.