TRINITY UNIVERSAL INSURANCE
COMPANY, Appellant,

v.

PONSFORD BROTHERS, a Co-Partnership,
Appellee.

No. 5798.

Court of Civil Appeals of Texas.

El Paso.

March 29, 1967.

Rehearing Denied April 19, 1967.

Kemp, Smith, Brown, Goggin & White and William J. Derrick, El Paso, for appellant.

Scott, Hulse, Marshall & Feuille and George W. Finger, El Paso, for appellee.

## OPINION

FRASER, Chief Justice.

On July 31, 1961, a corporation known as Dallas Building, Inc. (hereinafter described as "Dallas") had been awarded the contract to construct what is known as the Sun Bowl Stadium in El Paso. Trinity Universal Insurance Company had executed both payment and performance bonds for Dallas in favor of El Paso County. In other words, Trinity was surety for both the performance, and payment for the construction, of the Sun Bowl Stadium. Dallas had entered into a number of subcontracts such as those calling for dirt work, electrical construction, etc. On April 5, 1962, El Paso County declared Dallas in default and called upon Trinity, as the surety, to perform under its surety bonds. It is obvious from the record that there was not much time allowed to contact prospective bidders to succeed Dallas as general contractor, as Mr. Bill Mounce, attorney for Trinity, not only solicited bids from other general contractors to complete the Sun Bowl Stadium, but distributed copies of the plans and specifications along with a schedule prepared by Mr. Mounce showing the balances left in said purchase orders of Dallas and sub-

contractors and materialmen as of March 31, 1962. Although the default was declared on April 5, 1962, Mr. Mounce, on behalf of defendant Trinity, advised Ponsford Brothers, a co-partnership, plaintiff in the trial court, that its bid must be in his office by April 20, 1962. Plaintiff (appellee) submitted its bid to Mr. Mounce on April 20th, and alleges that paragraph 5 was included because plaintiff, as a potential general contractor to take over from Dallas, did not have time in the short period existing from April 5th to April 20th to make an adequate survey, inventory, etc., to enable plaintiff to make a definite and thorough bid. So plaintiff alleges that it incorporated in its bid the following paragraph (designated as paragraph 5):

"We are to be protected by Trinity Universal Insurance Company for amounts in excess of the balance due on contract (dated March 31, 1962) because of renegotiations or replacement of existing subcontractors or material suppliers."

Defendant Trinity accepted plaintiff's bid by letter dated April 25, and included in said letter a paragraph, also numbered 5, which reads as follows:

"You will attempt to negotiate similar contracts with all of Dallas Building, Inc.'s subcontractors and suppliers, Trinity will reimburse you for any amounts in excess of the balances shown on the schedule prepared by Dallas Building, Inc., dated as of March 31, 1962, resulting from such negotiations."

It then appears that plaintiff was unable to negotiate or renegotiate new contracts with two of the original Dallas subcontractors, as shown on the aforesaid schedule of March 31, 1962, for the balance left in the existing contracts. As alleged in its brief, plaintiff reported to Trinity's attorney, Mr. Bill Mounce, both verbally and by letter, as follows:

"As agreed, we have left the negotiations with Hammer and Gunnels, electrical

contractors, and Montgomery and Knight, earth mover, for your handling."

(Montgomery & Knight are variously referred to in the briefs, issues and answers as "Montgomery & Knight" and/or "Montgomery and Knight"). As events moved on, it appears that the defendant was able to satisfy the electrical contractors, but it soon became evident that Mr. Mounce could not obtain a surety or performance bond for Montgomery & Knight, whose subcontract was that of dirt work. It seems agreed that there was left the sum of $46,680.00 in the original dirt subcontract as of March 31, 1962. Apparently because of the inability to obtain a surety for Montgomery & Knight, plaintiff alleges that attorney Mr. Mounce instructed plaintiff to obtain other bids for the balance of the dirt work. Plaintiff did so and reported to Mr. Mounce a preliminary or estimate bid from Hugh McMillan to the effect that it would cost at lease $108,000.00 to complete the dirt work. The record indicates that Mr. Mounce and Trinity felt that it would be better or cheaper to go ahead with Montgomery & Knight on the ground that even if they had an overrun, it wouldn't be as much as the estimate submitted by Hugh McMillan. Mr. Mounce therefore, on May 7, 1962, entered into or created a letter contract between his client, defendant Trinity, and Montgomery & Knight to go on with the dirt work. Two pertinent paragraphs of this letter contract follow:

"This will evidence in writing the agreement between Trinity Universal Insurance Company (Trinity) and Montgomery and Knight Co. relative to your completing the grading, excavating and other dirt work on the Sun Bowl Stadium.

"1. You will execute a subcontract with Ponsford Brothers, which sub-contract will be substantially the same as your original sub-contract with Dallas Building, Inc., dated August 16, 1961, except that the total consideration will be $60,651.98. You will commence work under such sub-contract Tuesday morn-

ing, May 8, 1962, and complete same in a good and workmanlike manner in accordance with said sub-contract."

Montgomery & Knight commenced work on Tuesday morning, May 8th. It is alleged that Mr. Mounce then instructed plaintiff to enter into its usual form of subcontract with Montgomery & Knight for the completion of the dirt work, with a copy of the Trinity-Montgomery & Knight letter dated May 7, 1962 attached thereto, of which the two paragraphs quoted above were a part. Mr. Mounce, representing Trinity, approved the form and wording of the subcontract between plaintiff and Montgomery & Knight before it was signed late in the afternoon of May 8th. It is pointed out that Montgomery & Knight had already begun work the day before, and it is alleged that plaintiff knew that it would probably cost at least $108,000.00 (the lowest estimate submitted) to complete the dirt work. As further evidence of the reason for the apparent desire of Trinity and Mr. Mounce to keep Montgomery & Knight on the job to complete the dirt work, the following excerpt from a letter dated May 8th, written by Mr. Mounce to defendant Trinity, is included which, inter alia, states:

"If at this point Montgomery and Knight Co. walk off the job, then there is a possible loss to Trinity * * * You will recall that under Ponsford's contract with Trinity, Ponsford is to be reimbursed for all amounts in excess of $46,680.00 for the dirt work * * * If Montgomery and Knight Co. complete their contract, in my opinion, we will have saved approximately $75,000.00 on the dirt work alone."

It is also alleged that plaintiff kept Mr. Bill Mounce fully advised on the progress and costs. When it became apparent that Montgomery & Knight were beginning to overrun the balance left in their subcontract, it was agreed that plaintiff would advance the actual expenses for Montgomery & Knight in completing the dirt work

and leave the decision as to responsibility for the overrun to be decided when the job was completed, which was confirmed by letter from the defendant's attorney. It is then alleged by appellee-plaintiff that the actual overrun of Montgomery & Knight, without profit or overhead allowance, was $111,792.83, which amount had been advanced by plaintiff and the accounts thereof audited by defendant Trinity.

Suit was brought against the defendant-appellant by the plaintiff-appellee to recover the amount of said overrun, alleging that defendant was obligated to reimburse plaintiff for its losses or advancements to Montgomery & Knight on the dirt subcontract. In its brief appellee states that it, as plaintiff, was entitled to recover the amount of this overrun from defendant Trinity under several theories, as follows: First, that paragraphs 5 of the bid and acceptance provide that Trinity would be responsible for any overrun of an existing subcontractor shown on the March 31, 1962 schedule, and appellee urges that this paragraph is broad enough to substantiate such position, even if it negotiated a subcontract with an existing subcontractor without a subcontract performance bond. Appellee also maintains that Trinity attempts to interpret the said paragraphs 5 to mean that if appellee signed a subcontract with an existing subcontractor, then Trinity's responsibility would end. Appellee further maintains that if, on the other hand, the said paragraphs 5 are ambiguous or uncertain, or do not actually provide for the contingency that plaintiff might be unable to negotiate a subcontract with Montgomery & Knight (for the dirt work) in good faith, then, in any or either of such events, the intention of the parties in the bid and acceptance would control, and the actions of the parties at the time with their interpretation of paragraphs 5 should be given considerable weight. Secondly, if it appears that appellee did not negotiate a subcontract with Montgomery & Knight to complete the dirt work, then the May 7, 1962 contract (between Montgomery & Knight and Trinity) was actually the con-

tract to complete the dirt work, with defendant Trinity instructing both Montgomery & Knight and appellee to enter into a subcontract in substantially the same form as that executed between Dallas and Montgomery & Knight, for the purpose of coordinating the dirt work with the other contractors and making payments to the dirt contractor as the work progressed. Also, appellee points out that it was obligated to complete the Sun Bowl Stadium, and it was agreed that plaintiff would advance the expenses of Montgomery & Knight in the overrun and leave the determination of liability for the overrun until completion of the Sun Bowl contract with the County of El Paso. With regard to these two theories or positions of appellee, appellant urges vigorously that all that could be reasonably construed from the negotiations, letters, bids, etc., was that Trinity would reimburse appellee for any expenses necessary to renegotiate, rather than expenses incurred by appellee to complete *performance* of any part of the undertaking. In short, appellant maintains that once the arrangements had been completed, it was the responsibility and obligation of appellee, as general contractor, to stand good for any overruns. Finally, in its third theory, appellee maintains that if paragraphs 5 do not cover the contingency that appellee in good faith could not negotiate a subcontract with Montgomery & Knight, then, under said paragraphs, appellee was not bound to accept Montgomery & Knight without a performance bond and, under the doctrine of promissory estoppel, assurances made by Mr. Bill Mounce, whom appellee alleges to be the attorney and representative for Trinity, made to induce appellee to proceed with Montgomery & Knight, coupled with the reliance of appellee upon such assurance, estop defendant Trinity from denying its responsibility for the overrun. The record indicates that Trinity was kept fully informed of the problems of the dirt contractor and that plaintiff was advancing considerable sums of money to said contractor.

As stated by appellant in its brief, "Trial to a jury resulted in verdict for plaintiff in the sum of $111,792.83. Hence, this appeal."

Appellant's first point of error alleges that there is no evidence to support the jury's answer to Question No. 1; and the second point is that the answer to said Question No. 1 is so against the great weight and preponderance of the evidence as to be clearly wrong. This question, or special issue, resulted in the jury's finding that plaintiff and defendant mutually intended that defendant Trinity would be liable for any overrun of Montgomery & Knight in completing the dirt work on the Sun Bowl Stadium over and above the sum left in the original contract. This question or special issue was worded as follows:

"Do you find from a preponderance of the evidence that in making the contract consisting of the bid and acceptance of the bid, being plaintiff's exhibits P–5 and P–6, by paragraphs 5 thereof, plaintiff, Ponsford, and the defendant, Trinity, mutually intended that the defendant, Trinity, would be liable for any over run of Montgomery and Knight, in completing the dirt work on the Sun Bowl Stadium, over and above the sum left in the original dirt contract, including retainage, with Dallas Building, Inc.? Answer 'yes' or 'no'.

"In connection with this issue you are instructed that in determining the intent of the parties you may take into consideration the facts and circumstances surrounding the making of the agreements set out in plaintiff's exhibits 5 and 6. You are further instructed that you may take into consideration any acts done mutually by the parties in the performance of said agreements, and any mutual interpreting actions of the parties in connection therewith.

"We answer: *Yes*."

Under the "no evidence" point, we must consider only the evidence that

tends to support the findings, and disregard all evidence contrary thereto; and in determining whether the findings are against the great weight and preponderance of the evidence, we must weigh and consider all the evidence in the case. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660; Tudor v. Tudor, 158 Tex. 559, 314 S.W. 2d 793 (Tex.Sup.Ct., 1958). After careful study of the record in the light of the rules set forth above, we believe that appellant's first and second points must be overruled, as it is our opinion and holding that there is not only evidence to support the jury's finding, but there is ample and sufficient evidence to warrant the jury in finding as it did. We have set forth the provisions of paragraphs 5 and have included statements and quotations from the record in our description or recitation of the nature of the case. It seems obvious to us that the wording of these paragraphs 5, which are found in the bid and in the acceptance documents, indicate that it was mutually intended at that time that Trinity would protect plaintiff for amounts necessarily expended in excess of the balance due on the dirt moving contract, based on the schedule of March 31, 1962.

As we have heretofore stated, both parties knew that the dirt movers, Montgomery & Knight, could not obtain a bond, nor could attorney Mr. Mounce obtain a bond or surety for them. Also plaintiff, as general contractor, was responsible for the completion of the entire job and for the work and debts of the subcontractors, material men, etc. After paragraphs 5 had been exchanged between the parties in the bid and acceptance, it will be remembered that plaintiff finally told Trinity that it could not negotiate a contract with Montgomery & Knight. This is illustrated by our quotes on page 2 of this opinion, wherein plaintiff, both verbally and by letter, stated to defendant that it was leaving the negotiations with Montgomery & Knight for handling by the defendant. Also it must be considered that there was some correspondence and discussion between Mr.

Mounce and his client, Trinity, part of which we have heretofore included as a quote from a letter from Mr. Mounce to Trinity, wherein he stated that it would probably be better to go along with Montgomery & Knight even though it had become impossible to secure a surety for their performance. Then, in a letter dated May 8, 1962, written by Mr. Mounce to his client, Trinity, he stated, "You will recall that under Ponsford's contract with Trinity, Ponsford is to be reimbursed for all amounts in excess of $46,680.00 for the dirt work. He then went on to say that if they could get Montgomery & Knight to complete the work, he felt that they would save at least $75,000.00 on the dirt work alone. Then, too, it must be remembered that it is in the record as testimony that Trinity knew that contractor McKee, one of the bidders, would not accept Montgomery & Knight without a bond, or unless McKee was protected by Trinity for the completion cost of the dirt work. Further, there is no evidence that the retention of Montgomery & Knight was of any benefit to anyone except defendant; also, that the estimate secured from McMillan (which was the lowest) amounted to the sum of $108,000.00 to finish this dirt work. These matters should be borne in mind along with many other attendant circumstances, all of which are in the record, were in existence, and known to the parties. Then there was the emergency situation existing because the County had given Trinity only fifteen days to perform, after declaring the original contract with Dallas in default. This emergency is further illustrated by testimony that this particular dirt moving job would require a thorough analysis or coring, which would take a minimum of two weeks before a potential bidder could make a satisfactory offer. Hence paragraphs 5 in the bid *and* acceptance. Also, it is shown in the record that Trinity requested plaintiff to attempt to negotiate or re-negotiate with all of the people who had been dealing with Dallas as subcontractors, suppliers, material men, etc. It is in testimony that Ponsford Brothers were able to make

arrangements with all of the so-called "subs", etc., except the electrical subcontractor and the dirt mover; that in some cases where more money was needed, defendant had provided the excess. We think this résumé of some of the more salient features of the conditions and circumstances existing at the time of the bid and the acceptance sufficiently explain and substantiate the meaning and wording of paragraphs 5 as well as the wording of Question No. 1 and the jury's answer thereto. It is not contradicted that the plaintiff here bid well over a million dollars as general contractor and did, in fact, complete the job. Therefore, we feel and hold that there was ample evidence to sustain the jury's finding in its answer to Question No. 1, and therefore appellant's points to the effect that there was no evidence, or the answer was against the great weight and preponderance of the evidence cannot be substantiated or sustained.

■ There is much discussion and controversy between the parties as to whether parol evidence should have been admitted, but we do not feel that it was error to permit the use of parol testimony under the circumstances as they existed at the time and between the parties. This does not mean that we believe or find that paragraphs 5 are ambiguous, but we believe the position of appellee in urging that parol evidence can be admitted, not to vary the terms of the written instrument, but to present proof of circumstances and existing conditions, so that the intent of the parties to the written instrument can be properly determined, is sound. We agree with appellee's position that in this particular matter, attending circumstances and conditions make it desirable to permit proof by documentary and verbal evidence in order to accurately portray and determine the mutual intent of the parties to the instrument. As we have said before, plaintiff took over the job on a bid amounting to almost one and a quarter million dollars, and finished it. It is not clear why, or for what reason, plaintiff should have any

desire to employ or continue the use of Montgomery & Knight for the purpose of doing the dirt work. The record shows these people were already in financial trouble and were in some disagreement with defendant, and of course the record further shows that there were other contractors who were willing to bid on or undertake the job only if properly protected either by a surety bond or a satisfactory arrangement with defendant Trinity on their bid. But, as we have stated above, Trinity's attorney, Mr. Mounce, and Trinity were anxious to keep Montgomery & Knight on the job, and it seems clear to us that this is the reason that Ponsford Brothers agreed to let them continue, and, of course, was one of the main reasons for Ponsford's paragraph 5 and the wording thereof. Also, it is in the record that plaintiff kept Mr. Mounce, as attorney for defendant, fully informed as to developments, expenses, etc.

Now we come to the latter part of the year 1962, and by this time Montgomery & Knight had become insolvent, and plaintiff began advancing funds to Montgomery & Knight, the total of which was the amount of the judgment in this suit, to-wit, $111,792.83 (excluding attorneys' fees and interest on the judgment). The record further reveals that the parties agreed that the responsibility for these advancements by Ponsford to Montgomery & Knight would be decided later on. These, along with the other facts of this record, to our minds justify the position of plaintiff in the court below—that he had the right to bring in both verbal and written testimony to show the mutual intent of the parties with reference to the matter, and particularly paragraph 5. Although appellant firmly asserts that all that it intended was that appellee would be paid for any expenses resulting from negotiation with the "subs", and that once this had been done Trinity was no longer under any obligation to pay any loss incurred by plaintiff as a result of any activity of any of the "subs", we do not believe such position can

be substantiated, because, as heretofore pointed out, plaintiff, at the request of defendant, retained Montgomery & Knight on the job without any surety to insure performance. (Of course the general contractor has to guarantee complete performance of the job.) It is further obvious, therefore, that the admission of parol and documentary testimony was not only desirable here, but extremely helpful in enabling the jury to determine the answer to Question 1—to-wit, the mutual intent of the parties. Also, it must further be remembered and considered that a contract had been entered into between Montgomery & Knight and defendant, through Mr. Mounce, on May 7th for the continuation of the dirt work, one provision of which was that Montgomery & Knight would resume work on May 8th. This is explained in the testimony as the result of a dispute between defendant and Montgomery & Knight over the retainage held by defendant, and the fears and/or dilemma that defendant found itself in, which the record revealed to be that apparently defendant was afraid to pay the retainage over to Montgomery & Knight for fear they would simply pocket the money and walk off. Also they were somewhat apprehensive that if they didn't pay it, Montgomery & Knight would refuse or be unable to continue work. Hence the contract between the dirt mover and defendant, dated May 7th. Then defendant instructed both Montgomery & Knight and plaintiff to enter the usual form of subcontract. This form was approved by Mr. Mounce and was executed late in the afternoon of May 8th, which was after Montgomery & Knight had already started work, and gives rise to the allegation that the contract for dirt work was really between defendant and Montgomery & Knight, the plaintiff merely acting as coordinator or overseer. Plaintiff points out that it would be a strange, unbelievable situation were a general contractor to enter into a subcontract, involving many thousands of dollars, with a firm that could not even get a performance bond, leaving the general contractor liable for any failures or debts of the subcontractor.

In addition to the jury's answer to Question 1, as set forth above, in answer to Question 10, the jury held (by the answer "No") that it was not mutually intended by plaintiff and defendant that defendant Trinity would be obligated to reimburse plaintiff only for the amount by which any new supplemental contract price exceeded the balance shown on the schedule of March 31, 1962. Then, in Question 12, the jury was asked whether or not the plaintiff and defendant, in their agreement consisting of the April 20, 1962 letter or bid of plaintiff, and the letter of acceptance of April 25, 1962 from defendant, mutually intended that plaintiff Ponsford was required to enter into a new subcontract with Montgomery & Knight without regard to whether Montgomery & Knight could be bonded, even though Montgomery and Knight should be willing to enter into such contract. To this the jury answered "No".

■ To sum up, it has long been the law that the basic rule in construing a contract is to ascertain the intention of the parties from the words used in the contract, construed in the light of the facts and circumstances surrounding the parties at the time the contract was made, as well as the purposes sought to be accomplished, and such proof or evidence is not considered to be an attempt to vary the terms of an executed instrument.

Reed v. Merchants' Mutual Ins. Co., 95 U.S. 23, 24 L.Ed. 348; (a case many times cited and followed)

Gulf Liquid Fertilizer Co. v. Titus, 163 Tex. 260, 354 S.W.2d 378; (and the many cases and authorities cited and referred to therein)

Ryan v. Kent (Tex.Com.App.), 36 S.W.2d 1007;

13 Tex.Jur.2d, "Contracts", § 110;

32A C.J.S. Evidence § 1014 at p. 616;

32A C.J.S. Evidence § 972 at p. 454;

Callaway v. Albin (Tex.Com.App.1924) Op.Adopt. Sup.Ct., 114 Tex. 5, 261 S.W. 372;

Knutson v. Ripson, 163 Tex. 312, 354 S.W.2d 575.

The Supreme Court in the last cited case approved submission to the jury of what the agreement was, citing many other cases and authorities as illustrating and authorizing this holding.

We therefore overrule appellant's Points 1 and 2.

Appellant's third point alleges that there was no evidence to support the jury's finding in answer to Question 4, that the dirt subcontract between plaintiff and Montgomery & Knight was actually an agreement between defendant and Montgomery & Knight, with plaintiff being used solely for the supervision and coordination of the work and disbursement of the funds. Appellant's fourth point alleges that the jury's answer to the above stated question is against the great weight of evidence and clearly wrong.

We feel that these points must be overruled for the following reasons: It must be remembered that plaintiff had left the negotiations for the dirt work to defendant, as set forth earlier in our opinion; that Montgomery & Knight had already begun work before the form subcontract between them and plaintiff was executed late in the day of May 8, 1962; that this was more than a week after plaintiff's bid had been sent in and accepted; that Mr. Mounce had suggested leaving Montgomery & Knight on the job, and specifically stated in his letter to defendant Trinity that Ponsford was to be reimbursed for all amounts in excess of the balance remaining as of March 31, 1962; that in the letter contract of May 7, 1962, entered into between Montgomery & Knight and Mr. Mounce and his client, defendant Trinity, part of which

we have previously quoted in this opinion, it is clear that the real dirt contract was entered into between Trinity and Montgomery & Knight one day before Ponsford signed his form subcontract with Montgomery & Knight. Furthermore, the record shows that defendant Trinity did not have time to allow the bidders to cross-section the land, etc., in order to determine the amount of dirt work left and figure the cost, and Mr. Mounce charged Trinity for the preparation of both the May 7th, and May 8th agreements. The record discloses that there was testimony to the effect that Mr. Mounce told plaintiff that the *agreement of May 7, 1962* would control over the printed form wording of the one executed the following day, and that Mr. Mounce also directed the plaintiff to be guided by the May 7, 1962 letter agreement.

■ It has been held that if two or more written instruments make up a single transaction, all must be construed together. 13 Tex.Jur.2d, "Contracts", § 116, p. 274.

■ If there should exist any reasonable doubt, then the matter should go to the jury to decide what the real agreement between the three parties actually was. 13 Tex.Jur.2d, "Contracts", § 110, p. 264; 17A C.J.S. Contracts § 520, p. 1002; McFarland v. Shaw (Tex.Com.App.), 45 S.W. 2d 193 at p. 196; 32A C.J.S. Evidence § 972 at p. 454; Gulf Liquid Fertilizer Co. v. Titus (supra). Lastly, when Mr. Mounce wrote Mr. Dabney (of Trinity) on May 8, 1962 enclosing his May 7, 1962 agreement with Montgomery & Knight, as stated before, he said, "Ponsford is to be reimbursed for all amounts in excess of $46,680.00 for the dirt work". Later on, in his testimony, Mr. Mounce admitted that he probably told Ponsford the same thing. There seems no evidence in the record to indicate that Mr. Dabney, whose authority to act for Trinity is well established, made any objection or correction to the May 7, 1962 letter contract executed for Trinity by Mr. Mounce.

■ For these reasons, and under the authorities set forth above, we hold that there is evidence to support the finding of the jury in answer to Question 4, and the evidence was sufficient, so that such finding is not against the great weight and preponderance of the evidence. Appellant's Points 3 and 4 are therefore overruled.

■ In its fifth and sixth points, appellant alleges that there was no evidence, and/or that the evidence was insufficient to support the finding of the jury in answer to Question No. 5, that when the defendant executed the letter agreement of May 7, 1962 with Montgomery & Knight, and plaintiff executed the subcontract of May 8, 1962 with Montgomery & Knight, it was mutually intended by plaintiff and defendant that defendant would be responsible for any overrun of Montgomery & Knight in excess of the balance left in the original dirt subcontract with Dallas.

We believe that these points must also be overruled, for the reasons and under the authorities hereinabove set forth. We think this matter has been clearly and adequately covered earlier in this opinion; and so, without further discussion, we overrule appellant's fifth and sixth points.

■ Appellant's seventh point alleges that there was no evidence to support the finding of the jury in answer to Question No. 6, that William Mounce induced plaintiff to execute the May 8, 1962 subcontract with Montgomery & Knight by assuring plaintiff that plaintiff would be reimbursed for all amounts in excess of $46,680.00 in completing the dirt work. Appellant's eighth point states that the jury's answer thereto (favorable to the plaintiff) is so against the great weight and preponderance of the evidence as to be clearly wrong.

We think these points must be overruled for the following reasons: Mr. Mounce, in his testimony, was reminded of one of his letters to Mr. Tom Dabney, who was supervisor of the Fidelity and Surety Claims Department for Trinity and who was, according to the testimony, charged with the responsibility for handling all surety and contract matters for Trinity which arose within his jurisdiction anywhere in the United States. In this letter, as we have set forth before, Mr. Mounce stated: "You will recall that under Ponsford's contract with Trinity, Ponsford is to be reimbursed for all amounts in excess of $46,680.00 for the dirt work". In testimony, he was asked if he recalled that statement in the aforesaid letter, and he said that he did. He was then asked if, having made the above statement to Mr. Dabney on May 8th, it would be a reasonable inference that he, Mr. Mounce, had probably told Harry Ponsford the same thing on or about that time. His answer was, "Well, I am sure that in the entire context I may have told them. There wasn't any question that Trinity was to make up the difference on those balances, if those balances ran more, or if they were unable to execute a subcontract for $46,680.00 that Trinity had to pick up the excess." Then later on, Mr. Mounce testified that to the best of his recollection, he felt that he had told Ponsford substantially the same thing as he told Mr. Dabney in the letter in which he also stated that such arrangement would likely save Trinity at least $75,000.00 on the dirt work alone.

One of the exhibits is a copy of the power of attorney granted to Mr. Dabney by Trinity. It is further brought out in the testimony that Mr. Mounce was the only Trinity representative in El Paso dealing directly with Mr. Dabney, whose duties and responsibilities we have described above and which are fully set out in the certified copy of Mr. Dabney's power of attorney which was furnished to plaintiff by Mr. Mounce. Also, the testimony reveals that Dabney specifically instructed Mr. Mounce to solicit competitive bids, defend Trinity in litigation and to do many other things on behalf of Trinity. Mr. Mounce, while stating that he could not recall the exact language, did state that he admitted sug-

gesting to plaintiff that his bid be conditioned upon the said balances left by Dallas as of March 31, 1962; that he was sure that plaintiff realized that if the difference was to be made up, it would have to be made up by Trinity, and that in view of the short time which Trinity had to furnish a new contractor, that he (Mr. Mounce) granted permission to the contractors to condition their bids on the assumption that the dirt work could be completed for the amount left in the subcontract. This recollection of Mr. Mounce's is confirmed in his letter of November 26, 1962 in which he stated that all of the interested contractors were very concerned over the dirt work, and requested permission to condition their bids on the assumption that the dirt work could be completed for the amount left in the subcontract. He then stated in testimony that such permission was granted to the several contractors who were preparing bids. It is then in testimony, as we have previously set forth, that after the general contract had been awarded to plaintiff, it developed that it was impossible to secure a surety for Montgomery & Knight, and that the lowest estimate or bid for the dirt work alone was submitted by Hugh McMillan in the sum of $108,000.00, and this information was passed on to Mr. Mounce by plaintiff, with the additional information that such was not a firm bid, but more of an estimate. Other contractors stated that they would not make any kind of bid unless they had at least two weeks to survey the dirt moving job. Then we encounter the testimony of Mr. Ponsford, that Bill Mounce had said: "Let's go ahead with Montgomery & Knight, because if they do over run, it probably will not be as much as Mr. McMillan wants". Mr. Ponsford, on behalf of plaintiff, also testified that two other construction companies told him that it was going to cost considerable money to prepare a bid, and that it would take a surveying crew at least two weeks, and that these other companies were willing to do that if a definite opening date for bids was set and the low bid accepted.

In conclusion, it is apparent that there wasn't enough time for anybody to make a definite and responsible bid, and the lowest estimate for the dirt work was $108,000.00 which, along with the statements and information from other contractors, was conveyed by plaintiff to Mr. Mounce. Therefore, when Mr. Mounce had received all this information, according to Mr. Ponsford's testimony, he (Ponsford) was told by Mr. Mounce to go ahead with Montgomery & Knight because their overrun would likely be less than the lowest bid or estimate. Mr. Ponsford testified that after getting all this information, that Hugh McMillan had submitted actually only a preliminary figure, to-wit, $108,-000.00, and that it was not a bid, that that it would cost at least that much and he couldn't say how much more until they made the figure definite (presumably by a thorough survey).

Therefore this background indicates to us that there was evidence to support the jury's finding in their answer to Question 6, and that such finding was not against the preponderance and great weight of the evidence and therefore clearly wrong. Appellant's Points 7 and 8 are therefore overruled.

■ Appellant's Point 9 alleges that there was no evidence to support the jury's answer to Question 7, wherein they found that Mr. William Mounce, in inducing plaintiff to execute the May 8, 1962 subcontract, was acting within the scope of his express or implied authority as defendant's agent. Appellant's Point 10 claims the answer of the jury is so against the great weight and preponderance of the evidence as to be clearly wrong.

It is our decision that these two points must also be overruled. As stated earlier, Mr. Tom Dabney was supervisor of the Fidelity and Surety Claims Department for defendant and his certified power of attorney is of record. The record shows that Mr. Mounce was defendant's only representative in El Paso, that he dealt directly

with Mr. Dabney, and no one else employed by defendant. In April, 1962 testimony shows that Mr. Dabney told Mr. Montgomery (one of the firms holding the dirt moving subcontract) that Bill Mounce was handling all matters on the Sun Bowl, and referred Mr. Montgomery to Mr. Mounce. Mr. Dabney instructed Mr. Mounce to work out some satisfactory arrangement with plaintiff Ponsford and Montgomery & Knight. This instruction, according to the testimony, occurred on May 4, 1962, some several days before the letter contract of May 7, 1962 between the dirt movers and Trinity, and the execution by Ponsford and Montgomery & Knight of the form subcontract of May 8, 1962. As heretofore mentioned, Mounce was specifically instructed by Dabney to solicit competitive bids, to defend Trinity in matters of litigation involving suits by creditors against Dallas Building, Inc., and to assume many other responsibilities and perform many other duties for Trinity. Mr. Dabney testified that Mr. Mounce kept him apprised of the activities of Mr. Mounce, and said, "I approved them". Mr. Ponsford testified on behalf of the plaintiff that at no time until the filing of the lawsuit did anyone from Trinity advise or tell Mr. Ponsford that there was any limitation on what Bill Mounce could do or could not do for Trinity. This testimony, of course, must be considered along with all of the activities and negotiations conducted by Mr. Mounce after the default by Dallas had created an emergency, not only in finding another general contractor, but especially with regard to the subcontracts of Dallas, particularly that one involving dirt moving.

For all these reasons we must hold that there was evidence to support the finding of the jury, and further that the evidence was sufficient so that the jury's answer was not clearly wrong because of being against the great weight and preponderance of the evidence. Appellant's Points 9 and 10 are therefore overruled.

Appellant, in its 11th point, alleges as follows:

"There was no evidence to support the finding of the jury in answer to Question No. 9 that Plaintiff in good faith relied upon such assurance found by the jury in answer to Question 6 at the time Plaintiff signed the agreement of May 8, 1962."

Its 12th point alleges that the said finding of the jury with regard to its answer to Question No. 9 was so against the great weight and preponderance of the evidence as to be clearly wrong.

We think these points, also, must be overruled. We do not deem it necessary at this point to again review and repeat all of the many circumstances surrounding the parties at the time the plaintiff signed the May 8th agreement. This matter has, we feel, been adequately covered earlier in this opinion and it would serve little purpose to go again into the emergency conditions existing, the various problems between all of the parties concerned, etc. However, without reviewing all of the matters which we have heretofore set forth, we feel that all of them contributed to the situation that caused plaintiff to allege, and the jury to believe, that plaintiff relied in good faith on representations that defendant would be responsible for any overrun of the dirt movers in excess of the balance left in the original dirt subcontract with Dallas Building, Inc. It is in the testimony that at the time plaintiff signed the form subcontract of May 8th, the plaintiff knew that McMillan's estimate was that it would cost at least $108,000 to complete the dirt work. Also it is in the testimony that, in answer to a question, Mr. Ponsford stated that he would never have signed the said subcontract unless he had been assured by Mr. Mounce that Trinity would be responsible for any overrun. On the basis of the preceding facts and incidents leading up to the two contracts of May 7th and May 8th, 1962, coupled with the testimony, which apparently the jury believed, we hold that there was ample evidence to sustain the jury's answer to Question No. 9; and this, of course, disposes of the "no evidence" point as well. Plaintiff's Points 11 and 12 are therefore overruled.

Appellant's Point 13 alleges error in the court's refusal to grant its motion for instructed verdict; and appellant's 14th point charges the court with error in refusing to grant defendant's motion and supplemental motion for judgment non obstante veredicto. Appellant argues that the court should have granted its motion for an instructed verdict because the offer letter of April 20, 1962 and the acceptance of April 25, 1962 were clear and unambiguous, obligating defendant only to pay the amount by which each new supplemental contract price exceeded the old balance, and evidence to the contrary is incompetent and without probative force; that there was no evidence that either agreement was ambiguous; that the Statute of Frauds barred recovery because plaintiff seeks to recover on a verbal promise that defendant would reimburse it for its losses, and that such constitutes an agreement not in writing to answer for the debt, default or miscarriage of another. Defendant brings up again that there is no evidence of any authority on the part of William Mounce to bind defendant by any assurance or agreement; that there was no evidence of any agreement between plaintiff and defendant after the acceptance of April 25, 1962, obligating defendant to reimburse plaintiff for its losses by virtue of the failure of Montgomery & Knight to perform. The court overruled the motion. After the verdict was returned, defendant filed its motion for judgment non obstante veredicto on the grounds, among others, that the bid and acceptance letters of April 20th and April 25th, 1962, plainly obligated defendant only to pay the amount of the new supplemental contract in excess of the old balance, as shown on the March 31, 1962 schedule, and parol evidence to the contrary is incompetent and without probative force; that the May 7th contract was solely between defendant and Montgomery & Knight; that the May 8th agreement was between plaintiff and Montgomery & Knight, to which defendant was not a party; that such agreement was plain, clear and unambiguous, and parol evidence was inadmissible and im-

proper to vary or contradict the terms thereof; that there was no evidence of probative force that attorney William Mounce gave plaintiff any assurance that defendant would reimburse plaintiff for all its losses in completing the dirt work, nor was there any evidence of probative force that William Mounce had any kind of authority to bind the defendant by any such assurance; and lastly, that the "assurance" found by the jury in answer to Question 6 was barred by the Statute of Frauds, Art. 3995, Vernon's Ann.Tex.Civ.St. The court overruled these motions and rendered judgment for plaintiff.

Plaintiff urges that defendant is estopped to deny the enforceability of its promise under the Statute of Frauds, because plaintiff maintains that it was induced to rely upon defendant's assurance that defendant would reimburse plaintiff for all amounts in excess of $46,680.00 in completing the dirt work. In pursuance of this contention plaintiff pleaded that defendant induced it to enter into the May 8, 1962 subcontract and represented to plaintiff that defendant would reimburse it for any loss sustained by plaintiff as the result thereof, and appellee asserts that defendant knew full well that plaintiff would not enter into any such subcontract with Montgomery & Knight without such assurance because of the situation Montgomery & Knight was in, especially with reference to their inability to secure a satisfactory bond. Plaintiff further maintains that in reliance upon such representation, the May 8th subcontract between it and the dirt movers was executed, and defendant is now estopped to deny reimbursement to plaintiff for the sum of $111,792.83 advanced by plaintiff for completion of the dirt work. Plaintiff further points out that the jury found that the assurance was made and that defendant did rely on same in good faith.

Plaintiff-appellee relies on the doctrine of "promissory estoppel", which is described in Wheeler v. White (Sup.Ct.1965), 398

S.W.2d 93, wherein our Supreme Court states as follows:

"Where a promisee acts to his detriment in reasonable reliance upon an otherwise unenforceable promise, courts in other jurisdictions have recognized that the disappointed party may have a substantial and compelling claim for relief. The Restatement, Contracts, § 90, says:

" 'A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'

"According to Dean Hildebrand's Texas Annotation to the Restatement, Texas follows Section 90, supra. See Ferguson v. Getzendaner, 98 Tex. 310, 83 S.W. 374 (1904); Morris v. Gaines, 82 Tex. 255, 17 S.W. 538 (1891); and others."

The court further points out that the vital principle of estoppel is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by destroying the expectations upon which he acted. Also, in Gulf Liquid Fertilizer Co. v. Titus, 163 Tex. 260, 354 S.W.2d 378, our Supreme Court clearly states that a promise, although oral, is not within the Statute of Frauds where the main purpose of the promissor was to subserve some purpose of his own. The court further makes a distinction between a verbal promise to stand good or be surety for debts of another, and a situation where the promissor has, in effect, made the debt his own and has assumed primary responsibility. Appellee also points out that defendant knew, or had reason to know, that Montgomery & Knight could not complete the dirt work for the contract balance remaining as of March 31, 1962; that the dirt movers were having financial difficulties and could not get a bond; that it was defendant who suggested that plaintiff use Montgomery & Knight for reasons which appear earlier in this opinion; that defendant instructed Mounce to work out satisfactory arrangements between plaintiff and Montgomery & Knight. That in addition to the McMillan estimate of $108,000.00 to complete the job, there was testimony that McKee, a contractor, figured that it would cost $177,000.00 to complete the work; and in reliance upon such assurance, based on all the facts heretofore mentioned, plaintiff did go ahead and use Montgomery & Knight and maintains that it sustained a loss of $111,792.83.

We believe that these two points must be overruled. It is clear that the Statute of Frauds was designed to prevent fraud, and the doctrine of estoppel was a sort of unwritten law to prevent the improper use of the Statute of Frauds. We think it proper here again to mention that plaintiff Ponsford testified that Mr. Mounce suggested as follows: "Let's go ahead with Montgomery and Knight, because if they do over run, it will probably not be as much as McMillan wants". Plaintiff urges that Trinity's main purpose in making such assurance to plaintiff was to subserve its own interest in avoiding delay and expense in having another subcontractor cross-section the dirt work, and to avoid litigation with Montgomery & Knight over the retainage held by Trinity. The statement by Mounce on behalf of defendant upon which plaintiff maintains it relied constitutes, in our minds, an enforceable promise, because it appears to us that the relationship between plaintiff and defendant was not solely that of suretyship, as described and discussed above. Then, too, plaintiff maintains that a contract does not necessarily have to be in express terms—it may be implied in fact from the facts and circumstances of the case. 13 Tex.Jur.2d, "Contracts" § 5, p. 113; Texas & N. O. Ry. Co. v. New, 95 S.W.2d 170 (Tex.Civ.App., n. w. h.)

In the above case the court points out that words are not the only medium of expression. Conduct may often convey as clearly as words a promise or an assent to a proposed promise. Pickett v. Biggs, 307 S.W.2d 817 (Tex.Civ.App.); Turners, Inc. v. Klaus, 341 S.W.2d 182 (Tex.Civ.App., n. r. e.).

■ Appellant contends that Dabney had no authority to bind Trinity and therefore could not authorize Mounce to do so; that a general agency does not imply an authority to make a promise of guarantee; that Mounce had no express authority to make a promise of guarantee. After consideration of all the matters present and surrounding the parties during these negotiations, we think it unnecessary to again discuss the contention that neither Mounce nor Dabney could or did bind defendant as a surety for Montgomery & Knight, or to reimburse plaintiff for any overrun incurred by Montgomery & Knight. We should like to point out in this connection that it was known to all parties, according to the record, that plaintiff was advancing, beginning in the fall of 1962, substantial sums of money to Montgomery & Knight; in fact, it was agreed that the question of responsibility for such advancements would be decided after the job was finished. Therefore, Trinity knew what was going on, did not disavow any responsibility so far as we can tell from the record, but more or less sat back and let Ponsford get the job done as general contractor, and now declines to reimburse Ponsford for the advancements which it necessarily made for Montgomery & Knight. This, to our minds, brings in not only the theory of implied contract and acceptance thereof, but estoppel as well. It is obvious that Trinity was in danger of taking a tremendous loss because of the earlier default of Dallas, whom they had bonded; and to replace them, they had only fifteen days granted by the county officials of El Paso County. The scope of any authority is to be measured not alone by the words creating it, but by the whole setting in which those words

are used. 2 C.J.S. Agency § 97, p. 1221; Johnson v. Back, 378 S.W.2d 723 (Tex. Civ.App.); 2 C.J.S. Agency § 99, p. 1231 et seq.

On the basis of all of the facts herein stated, and on the basis of the authorities above set out, we believe and find that the statement made by Mr. Mounce to plaintiff constituted a contractual promise, made within the scope and course of his authority, and made primarily for the benefit and purposes of Trinity; and therefore Trinity became primarily obligated to reimburse plaintiff for all amounts in excess of $46,680.00 expended for completion of the dirt work. Furthermore, as stated before, we believe that defendant has estopped itself to deny the enforceability of its promise by using the provisions of the Statute of Frauds. As previously set forth, the promise was primarily for defendant's benefit, and not just an ordinary surety agreement.

Therefore, appellants' Points 13 and 14 must be overruled.

Appellant's Point 15 charges error because the court overruled its objections to the submission of Question No. 1. Its Points 16 and 17 also relate to the overruling of its objections to this question. Summed up, the three points claim that the contract was not ambiguous and should have been construed by the court and not submitted to the jury; that said question was a mixed question of law and fact and should not have been submitted to the jury, and lastly that the said question assumed the authority of William Mounce to bind defendant, which in effect amounted to a comment on the weight of the evidence.

Appellee has submitted counter-points claiming that all of appellant's Points 15 through 38 should not be considered by this court because they are voluminous, etc., and do not comply with Rule 274, Texas Rules of Civil Procedure. We feel these counterpoints should be overruled, and we will therefore proceed to pass on appellant's three points outlined above.

As to Points 15 and 16, we believe these points should be overruled because, as we have set forth earlier in this opinion, Question 1 seeks an answer as to the mutual intention of the parties involved and does not ask for any legal construction which might be a matter of law. We refer again to the case of Knutson v. Ripson, 163 Tex. 312, 354 S.W.2d 575, wherein the court points up the distinction between an issue of fact and one of law; and in the present case, it is our opinion that this question clearly inquires into the legal intent of the parties. As to Point 17, we again refer to our previous recitation of the facts and circumstances surrounding this matter, and would like to add further that the entire record shows that from the very beginning, back in April when Dallas was declared in default, defendant had only Mr. Mounce as its representative and/or agent in El Paso, and that through Mr. Mounce and Mr. Dabney, defendant was kept continuously and fully informed of the events and progress of the work at the stadium. In our opinion defendant is estopped to deny the acts or authority of Mr. Mounce because, by their silence while all of this matter was developing and while plaintiff was advancing this considerable sum of money, defendant in effect ratified the conduct of the proceedings. We therefore do not find merit in Point 17. For the above reasons, Points 15, 16 and 17 are overruled.

Appellant's Points 18 and 19 charge that the trial court erred in overruling defendant's objections to Question No. 2, said objections being that the question was evidentiary, put undue influence on the question of who negotiated the dirt contract with Montgomery & Knight; that it constituted a comment on the weight of the evidence and assumed the existence of disputed facts.

We must overrule these two points, as it is obvious, as previously set forth in this opinion, and in the record itself, that in the bid and acceptance correspondence between plaintiff and defendant, which was set forth by defendant, that plaintiff should attempt, in good faith, to negotiate a subcontract with Montgomery & Knight; and of course it will be remembered that it was not able to do so, and so notified the defendant, with the result that the May 7th and May 8th contracts were executed between defendant, plaintiff and Montgomery & Knight. Appellant's Points 18 and 19 are accordingly overruled.

In Points 20 and 21 appellant argues that the court was in error in overruling its objections to Question No. 3 on the ground that said question was evidentiary and assumed the existence of disputed facts constituting a comment on the weight of the evidence, and put undue influence on the question of who negotiated the contract. These points must also be overruled because it is apparent from the record that the question was justified and, in our opinion, was presented in proper form. Said Question No. 3 is as follows:

"Do you find from a preponderance of the evidence that plaintiff Ponsford, not being able to in good faith negotiate a contract with Montgomery and Knight satisfactory to them, if you have so found, left such negotiations to the defendant, Trinity? Answer 'yes' or 'no'.

"We answer: Yes."

We overrule these two points without further discussion or comment, as we feel the matter has been fully developed herein.

Appellant's Points 22, 23, 24 and 25 relate to Question No. 4. We believe these points must be overruled. Points 22 and 23 attack the court's ruling in overruling defendant's objections to said Question 4 on the ground that the subcontract was plain and unambiguous and parol evidence should not have been admitted, and that the question submitted a question of law to the jury. We find nothing new in these two points and feel that they have been adequately discussed and disposed of earlier in this opinion, as we have attempted to set up the facts and circumstances surrounding the execution of the subcontract between plaintiff

and Montgomery & Knight. Therefore, without further discussion, Points 22 and 23 are overruled.

Appellant's Point 24 states that there were no pleadings to support the submission of Question No. 4, and the court should have sustained defendant's objections to this effect. We overrule this point without discussion, as the transcript shows that plaintiff's pleadings are sufficient. Point 24 is therefore overruled.

Appellant's Point 25 claims that Question 4, by its wording, assumed the authority of William J. Mounce to bind defendant to a contract. Question 4, as it appears in the transcript, does not mention the name of William Mounce, but inquires as to the position and responsibility of Ponsford after the May 7th letter or contract had been executed between Montgomery & Knight and defendant. This point is therefore overruled.

Appellant attacks Question No. 5 in his 26th, 27th, 28th and 29th points, claiming that the issue and its answer were improper, a comment on the weight of evidence, multifarious, a double submission of an ultimate issue, and that there was no evidence to support the submission of Question 5. Question 5 asks the jury to determine if, when Trinity executed its letter agreement of May 7, 1962 with Montgomery & Knight and plaintiff Ponsford executed the contract of May 8, 1962 with Montgomery & Knight, it was mutually intended between plaintiff and defendant that in using Montgomery & Knight to complete the dirt work, Trinity would be responsible for any overrun of Montgomery & Knight in excess of the balance left in the original dirt subcontract with Dallas. These matters have all been discussed in this opinion, and we do not believe that these four points present anything new, or, that as worded, Question No. 5 constituted a comment on the weight of the evidence. We have tried to point out that the jury found, in answer to Question 4, that plaintiff was to be used as custodian, supervisor and disburser of funds with regard to the dirt work.

Therefore Question 5 comes in natural sequence to inquire if the mutual intention of plaintiff and defendant under such agreement was that defendant would reimburse plaintiff for any overrun as described above. We dispose of Point 29 without comment, as it argues that there was no evidence to support the submission of Question 5. Therefore, we hold that appellant's four points, described above, must be overruled.

Appellant's Points 30, 31, 32 and 33 charge that the court committed error in overruling defendant's objections to Question 6. This question asked the jury to find, from a preponderance of the evidence, whether or not William Mounce induced plaintiff Ponsford to execute the May 8, 1962 contract by assuring plaintiff that it would be reimbursed for all amounts in excess of $46,680.00 in completing the dirt work on the Sun Bowl Stadium. These points again charge error by the trial court in overruling defendant's objections to Question No. 8. We feel that Question No. 6 is not a comment on the weight of evidence, nor multifarious, nor too broad and indefinite, nor lacking in evidence to support its submission. The record itself indicates the need for this question and justifies its submission in the form in which it was presented to the jury. Also Question No. 6 was one of the points submitted by plaintiff dealing with promissory estoppel. We do not find merit in these four points. The matters concerned therein have been fully developed in the record and discussed and disposed of earlier in this opinion. We therefore overrule appellant's Points 30, 31, 32 and 33.

In Points 34, 35 and 36 appellant again charges error on the part of the trial court in overruling defendant's objections to Question No. 7, which question asked the jury to determine if William Mounce, in inducing plaintiff to execute the May 8, 1962 subcontract if so found, was acting within the scope of his express or implied authority as agent of the defendant, Trinity; to which the jury answered "Yes". These three points charge that the question was multi-

farious; that the court erred in failing to submit defendant's requested instruction defining the term "circumstantially proven" and that there was no evidence to warrant the submission of said issue.

We believe these points do not contain sufficient merit. It has been held that the trial court, in non-negligence cases, is entitled to submit a broad submission of special issues. 34 T.L.R. 138. We believe the trial court was not in error in failing to specifically define the term "circumstantially proven" because these are not words of particular and exclusive legal significance, but are described as words of ordinary parlance and should be and can be given their necessary, ordinary and popular acceptation. 57 Tex.Jur.2d, "Trial", § 515, p. 225. We believe the matter of sufficient evidence to warrant the submission of Question No. 7 has been decided and needs no further discussion. Appellant's Points 34, 35 and 36 are overruled.

Appellant's Points 37 and 38 charge that Question No. 9 was multifarious and that there was no evidence to support its submission. Question No. 9 asked the jury to determine from a preponderance of the evidence if plaintiff Ponsford, in good faith, relied on the assurance inquired about in Question No. 6, which was to the effect that Mr. Mounce assured plaintiff that it would be reimbursed by defendant for all overruns on the dirt work. We do not find this Question No. 9 to be multifarious, and we further find that the submission of said Question 9 is supported by evidence. This matter has been discussed earlier in this opinion, and pointed out that it is in testimony that Ponsford said he would not have signed the subcontract with Montgomery & Knight without said assurances. This question also is one of the issues which, plaintiff claims, establish promissory estoppel, and of course one of the basic elements of estoppel is the proof that the injured party did, in good faith, rely on a promise or promises of the promissor. Jones v. Mid-State Homes, Inc.,

163 Tex. 229, 356 S.W.2d 923 at page 926. Appellant's Points 37 and 38 are accordingly overruled.

Appellant's Point 39 charges that the court erred in rendering judgment for plaintiffs for attorneys' fees in the amount of $7,500.00. We have carefully examined this assignment and the matters and authorities relative thereto, and have reached the conclusion that the court did not commit error in allowing the said attorneys' fees. As previously set forth in this opinion, the findings of the jury substantiate the theory that the actual dirt contract was between Montgomery & Knight and defendant Trinity; that plaintiff permitted Montgomery & Knight to continue with the dirt moving and excavation based on assurances of defendant's attorney, Mr. Mounce, to the effect that defendant would be responsible to plaintiff for any overrun in the dirt moving feature of the job. The jury further found that plaintiff occupied the position, with regard to the dirt work, of coordinator, overseer, and disburser of funds. There is ample testimony, also, that when Montgomery & Knight began to get in trouble and plaintiff began to make disbursements to pay the labor and materialmen of Montgomery & Knight, defendant was kept fully informed of all of these disbursements and was aware that plaintiff was advancing money for such dirt work.

For these reasons we believe that plaintiff actually advanced the money to defendant Trinity for debts owed by Trinity, and this because the County of El Paso had declared Dallas Construction Company in default in April, 1962, and the completion of the job then became the concern and problem of defendant. In paying the laborers, materialmen, etc., with reference to the dirt work, it is our feeling that plaintiff was actually paying debts that were primarily owed by Trinity, and for which Trinity was primarily responsible. We also must consider that Trinity and Montgomery & Knight had entered into a contract for the completion

of the dirt work before plaintiff had entered into any kind of agreement with Montgomery & Knight. There is no evidence in the record that the May 7th contract between Montgomery & Knight and Trinity was ever canceled. For these reasons we believe that the ruling of the court was correct.

F. & C. Engineering Co. v. Moore, 300 S. W.2d 323 (Civ.App., 1957, wr. ref., n. r. e.); National Surety Corp. v. U. S., 327 F.2d 254 (5th Cir., 1964); (This case specifically refers to the case just cited above) Southwest General Const. Co. v. Price, 267 S.W.2d 855 (Tex.Civ.App., 1954); Mundy v. Knutson Construction Co., 156 Tex. 211, 294 S.W.2d 371;

H. Richards Oil Co. v. W. S. Luckie, Inc., 391 S.W.2d 135 (Tex.Civ.App., ref., n. r. e.);

H. B. Zachry Co. v. Ceco Steel Products Corp., Tex.Civ.App., 404 S.W.2d 113 at p. 135.

Appellant's Point 39 is therefore overruled.

 Appellant's Point 40 charges error in admitting testimony from the deposition of witness Frank Montgomery (of Montgomery & Knight). We think this point must be overruled because this testimony, according to the record, is involved with testimony first offered by defendant involving a conversation between Mounce and Montgomery. We agree with plaintiff that he was therefore entitled to introduce the balance of said conversation in order to explain the part previously admitted. 23 Tex. Jur.2d "Evidence", § 141, pp. 206–207. Also, we do not believe that defendant successfully discharged the burden of proving that even if the admission of such testimony was error, it was of such severity as to have reasonably been calculated to and probably did cause the rendition of an improper judgment in the case. Defendant does not, in our opinion, meet this requirement. Appellant's Point 40 is overruled.

Appellant's Point 41, in our opinion, must be overruled for the same reason set forth in our disposition of Point 40. Point 41 is therefore overruled.

All of appellant's points are overruled and the judgment of the trial court is in all things affirmed.