TRINITY UNIVERSAL INSURANCE COM-
PANY, a Corporation, Petitioner,

v.

PONSFORD BROTHERS, a Co-partnership,
Respondent.

No. B–297.

Supreme Court of Texas.

Jan. 17, 1968.

Kemp, Smith, White, Duncan & Hammond, William J. Derrick and Tad R. Smith, El Paso, for petitioner.

Scott, Hulse, Marshall & Feuille, Schuyler B. Marshall and George W. Finger, El Paso, for respondent.

POPE, Justice.

Ponsford Brothers, a partnership, sued Trinity Universal Insurance Company to recover the funds Ponsford advanced to a subcontractor to enable the subcontractor to complete its contract for the excavation and dirt moving work incident to the construction of the Sun Bowl Stadium. Ponsford sued upon a contract it had with Trinity. The trial court, upon the basis of jury findings, rendered judgment for Ponsford in the sum of $111,792.93 and $7,500.-00 attorney fees, and the court of civil appeals affirmed the judgment. 414 S.W.2d 16. Trinity urges a number of points, but most of them are satisfactorily treated by the opinion of the intermediate court. Decisive of the case will be our discussion of Trinity's points that the trial court erred in (1) treating the contract between Ponsford and Trinity as ambiguous, (2) admitting parol evidence of the surrounding circumstances to remove the ambiguity, (3) submitting a question of law to the jury, and (4) allowing attorney fees. We affirm the judgment below except for the allowance of attorney fees.

During 1961, Dallas Building Inc. made a general contract with El Paso County for the construction of the Sun Bowl Stadium. The County on April 5, 1962 declared that firm in default. Trinity was surety for the defaulting contractor upon its performance and payment bonds, and was then faced with the necessity of making prompt arrangements to complete the stadium without further losses. It hurriedly solicited bids from other general contractors. Trinity wanted to retain the original subcontractors and materialmen because they had partially performed, their contracts were for the most part satisfactory, and Trinity wanted to avoid possible claims or suits by them. The defaulting contractor had developed a schedule showing the contract price agreed upon by each of the subcontractors and suppliers, the percentage of their work completed and material supplied, and the balances left in the contracts which were unearned and unpaid. The balances were computed as of March 31, 1962. Trinity supplied each new bidder with copies of the schedule and the plans and specifications for the project. It advised all bidders to submit their bids by April 20, which was only fifteen days after the default by the original contractor. Everyone concerned knew that time was too short for bidders to make a careful estimate of completion costs, so Trinity also advised the bidders that they could condition their bids upon the completion of the work by the existing subcontractors for the sums shown by the March 31 schedule. It was at this point that four new contracts were made.

Ponsford and Trinity entered into the first contract. It is the basis of Ponsford's suit and recovery against Trinity. Ponsford submitted its bid on April 20, 1962 agreeing to complete the Sun Bowl Stadium for the sum of $1,224,000.00 based upon a number of conditions including the one in paragraph 5 of its letter bid.

"5. We are to be protected by Trinity Universal Insurance Company for amounts in excess of the balance due on contract (dated March 31, 1962) because of re-negotiations or replacement of existing subcontractors or material suppliers."

Trinity accepted Ponsford's bid on April 25 by a letter which both parties signed. By the letter contract, Trinity and Ponsford agreed upon a number of matters not contained in any of the other documents. Trinity agreed to pay for Ponsford's performance and payment bonds, to hold Ponsford harmless as to claims which might be asserted by the original defaulting contractor, to make adjustments of the allowance to which Ponsford might be entitled for materials on hand at the job site, and to pay Ponsford six per cent interest on any funds held by the County by reason of any action of the former defaulting contractor. Paragraph 5 of the letter was similar to paragraph 5 of Ponsford's bid. It is this paragraph 5 which Ponsford alleged was ambiguous. The paragraph is:

"5. You will attempt to negotiate similar contracts with all of Dallas Building, Inc.'s subcontractors and suppliers. Trinity will reimburse you for any amounts in excess of the balances shown on the schedule prepared by Dallas Building, Inc., dated as of March 31, 1962, resulting from such negotiations."

The second contract was the new general contract that Ponsford made with El Paso County to complete the Sun Bowl Stadium for the sum of $1,224,000.00. It is not significant in this particular suit.

The third contract was one which Trinity made with Montgomery and Knight on May 7. Montgomery and Knight had the subcontract for the excavation and dirt moving at the time the original general contractor defaulted. Ponsford, as it did with all of the other subcontractors and materialmen, undertook to make a new contract with Montgomery and Knight. Ponsford failed to make a new contract only in the instance of Montgomery and Knight, who proved to be so financially unstable that they could not provide a performance bond. That firm also refused to make a new contract until it received $27,-987.00 which had been retained by the defaulting general contractor. Only $46,-680.00 remained unpaid under the original dirt moving contract and that amount was known to be wholly insufficient to complete the excavation and dirt moving for the Sun Bowl construction. Ponsford reported its inability to contract with Montgomery and Knight, and Trinity then solicited bids from others for the dirt moving. The lowest bid received for completion of the dirt work was $108,000.00. Trinity then resumed negotiations with Montgomery and Knight and made a contract with that firm. The contract provided for partial payment to Montgomery and Knight of the sum retained by the original contractor, and Trinity agreed to pay $60,651.98 instead of $46,-680.00 for that firm's completion of the dirt work. The letter contract also required Montgomery and Knight to make a new subcontract with Ponsford in these words:

"This will evidence in writing the agreement between Trinity Universal Insurance Company (Trinity) and Montgomery and Knight Co. relative to your completing the grading, excavating and other dirt work on the Sun Bowl Stadium.

"1. You will execute a sub-contract with Ponsford Brothers, which sub-contract will be substantially the same as your original sub-contract with Dallas Building, Inc., dated August 16, 1961, except that the total consideration will be $60,651.98. You will commence work under such sub-contract Tuesday morning, May 8, 1962, and complete same in a good and workmanlike manner in accordance with said sub-contract."

The fourth contract was the subcontract executed by Ponsford and Montgomery and Knight. It was made on May 8 and consisted of Ponsford's form subcontract with a copy of the Trinity-Montgomery and Knight letter contract attached. The contract with Ponsford was made after Montgomery and Knight had commenced work pursuant to its contract with Trinity.

Montgomery and Knight were unable to complete the dirt work for the $60,651.98

which Trinity had negotiated. Ponsford and Trinity then agreed that Ponsford would advance the funds necessary to pay Montgomery and Knight's actual labor and costs while completing the dirt work. No decision was then reached with respect to the responsibility for such costs. Ponsford advanced $111,792.83 above the $60,651.98 which Trinity had negotiated, and then called upon Trinity to reimburse it for those advancements, but Trinity denied any liability.

The jury answered all issues favorably to Ponsford's several theories of recovery, finding that (1) the parties mutually intended that the defendant, Trinity, would be liable for any overrun of Montgomery and Knight, (2) Ponsford, in good faith, was not able to negotiate a contract with Montgomery and Knight, (3) Ponsford left such negotiations to the defendant, Trinity, (4) Ponsford was used solely for the supervision and coordination of the work and disbursement of funds left in the original contract between the defaulting general contractor and Montgomery and Knight as its subcontractor, (5) the parties mutually intended by the contract between Trinity and Montgomery and Knight and by Ponsford's new subcontract with Montgomery and Knight, that Trinity would be responsible for any overrun of Montgomery and Knight in excess of the balance left in the original dirt subcontract with the original defaulting contractor, (6) Trinity's agent induced Ponsford to execute the subcontract by assurances that Ponsford would be reimbursed for all amounts in excess of $46,680.00, (7) Trinity's agent was acting within the scope of his authority as Trinity's agent, (8) Ponsford in good faith relied upon Trinity's assurance. There were other issues not relevant to our disposition of this case.

In our opinion, the answer to the first special issue entitled Ponsford to a judgment, and we express no opinion concerning the legal effect of the other issues. The jury in answer to the first special issue found that Ponsford Brothers, by paragraph 5 of their letter bid on April 20 and Trinity, by paragraph 5 of its letter of acceptance on April 25, "mutually intended that * * * Trinity would be liable for any overrun of Montgomery and Knight * * *." The court instructed the jury that they could take into consideration the facts and circumstances surrounding the making of the agreements set out in those documents as well as any acts done mutually by the parties in the performance of the agreements. The jury found against Trinity on its converse issue which asked whether the two paragraphs 5 were "mutually intended by plaintiff, Ponsford, and defendant, Trinity, to mean that Trinity would be obligated to reimburse plaintiff, Ponsford, only for the amount by which any new supplemental contract price exceeded the balance shown on the schedule of March 31, 1962."

■ Trinity urges that its contract with Ponsford was unambiguous and meant that it would pay any difference between the balance shown by the March 31 schedule and the $60,651.98 provided in the new contract between Trinity and the dirt mover and later incorporated into a new subcontract by Ponsford. Ponsford alleged that the contract was unambiguous and, alternatively, asserted that it was ambiguous. Ponsford urges that it agreed to attempt to make a new contract with Montgomery and Knight, that it did so and failed, after which it was free to make a new contract with any other firm at a much higher price and with a company that could have made a bond. Ponsford says that Trinity would have been liable under such circumstances for the full cost. Ponsford says that it acceded to Trinity's desire to take the risk of an unbonded contractor who made a contract that knowingly was too cheap, because of the protective contract under which Trinity agreed that it "would reimburse you (Ponsford) for any amounts in excess of the balances shown on the schedule * * * dated as of March 31, 1962, resulting from such negotiations." Ponsford says that it understood Trinity's

commitment to mean that Ponsford would be protected for any excess cost "resulting from such negotiations," and that the default was a result of the negotiations with Montgomery and Knight. We agree with the holdings of the courts below that the meaning of the contract between Ponsford and Trinity was reasonably susceptible to more than one meaning and was ambiguous. Universal C.I.T. Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154, 157 (1951); Skelly Oil Co. v. Archer, 163 Tex. 336, 356 S.W.2d 774 (1962).

■ The trial court properly admitted evidence to remove the ambiguity of the words used in the contract. Skelly Oil Company v. Archer, supra; Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W.2d 504 (1942); Rio Bravo Oil Co. v. Weed, 121 Tex. 427, 50 S.W.2d 1080, 85 A.L.R. 391 (1932); Taylor v. McNutt, 58 Tex. 71 (1882); 13 Tex.Jur.2d., Contracts, § 127; 2 McCormick and Ray, Texas Law of Evidence, §§ 1681, 1685. Trinity particularly objected to the trial court's admission of a letter that its agent sent to Trinity on May 8. Trinity's agent wrote concerning the understanding he had reached with Ponsford on behalf of Trinity, "under Ponsford's contract with Trinity, Ponsford is to be reimbursed for all amounts in excess of $46,000.00 for the dirt work * * *. If Montgomery and Knight Co. complete their contract * * * we will have saved approximately $75,000.00 on the dirt work along." The evidence was properly admitted. It has been held that the practical construction placed upon a contract by the parties themselves constitutes the highest evidence of their intention. Lone Star Gas Co. v. X-Ray Gas Co., supra.

■ Trinity also objected to the court's submission of the first special issue on the grounds that it submitted a question of law. The issue inquired whether by Ponsford's bid and Trinity's acceptance those parties "mutually intended that defendant, Trinity, would be liable for any overrun of Montgomery and Knight * * * over and above the sum left in the original dirt contract * * *." A jury may not be called upon to construe the legal effect of an instrument. Knutson v. Ripson, 163 Tex. 312, 354 S.W.2d 575 (1962); Burgess v. Sylvester, 143 Tex. 25, 182 S.W.2d 358 (1944). The jury may, however, resolve an ambiguous intent, and the issue asked about intent as a fact issue. Skelly Oil Co. v. Archer, supra; Ellisor v. Kennedy, 128 S.W.2d 842 (Tex.Civ.App.1939, writ ref.).

■ We do, however, sustain Trinity's point that the courts below erred in allowing Ponsford an attorney fee in the sum of $7,500.00. The intermediate court rests its decision upon its conclusion that there was a direct contract between Montgomery and Knight on the one hand and Trinity on the other. That contract and all others are silent, however, about any contractual provision for attorney fees. Art. 2226, Vernon's Tex.Civ.Statutes is the only legal basis for Ponsford's claim for attorney fees against Trinity. As applicable here, recovery of attorney fees must be based upon Ponsford's furnishing labor and materials. Montgomery and Knight furnished the labor and materials, but that firm was paid and did not assert any claim for anything. Ponsford does not contend it furnished the labor and materials. Ponsford supplied the funds to Montgomery and Knight to pay for those items. Ponsford's action was for reimbursement of funds advanced, and was not for labor done and materials furnished. An analagous situation was presented in Verschoyle v. Holifield, 132 Tex. 516, 123 S.W.2d 878 (1939). The court held that one who advanced money to a subcontractor to pay for labor and materials was not entitled to the benefit of statutory liens and bonds given pursuant to a statute that was enacted for the benefit of those who furnish the labor and materials. Article 2226 was enacted for the benefit of one who supplied labor and materials and not for the benefit of one who furnished the funds to pay the supplier.

We affirm that part of the judgments below which awarded Ponsford $111,792.93 for the funds advanced to Montgomery and Knight. We reverse that part of the judgments below which awarded attorney fees to Ponsford, and render judgment denying all attorney fees. Three-fourths of the costs of appeal are adjudged against Trinity and one-fourth of the costs of appeal are adjudged against Ponsford Brothers. Rule 501, Tex.Rules Civ.Proc.