**VARO, INC., Appellant,**

**v.**

**Robert KROSS, Appellee.**

**No. 4675.**

Court of Civil Appeals of Texas, Eastland.

June 14, 1974.

Rehearing Denied July 19, 1974.

Dalton, Moore, Forde, Joiner & Stollenwerck (Sam S. Stollenwerck) Dallas, for appellant.

Dean Carlton, Dallas, Charles R. McBeth, Richardson, for appellee.

RALEIGH BROWN, Justice.

The issue presented in the instant case is whether a manufacturer's representative is entitled to commissions for sales made by him and accepted by the manufacturer but not paid for by the prospective purchaser.

Robert Kross formerly Robert Huebscher brought suit against his former employer, Varo Inc., seeking recovery of sales com-

missions allegedly earned pursuant to a Manufacturer's Representative Agreement. His claim for commissions is based upon agreements between Varo Inc., and third parties, being (1) a purchase agreement from Ramah Marketing Corporation, (2) a purchase agreement from Kool Enterprises, Inc., and (3) a machine lease agreement with Carl Combs, dba Kool Enterprises.

Kross contended that Varo's acceptance of the three written agreements entitled him to sales commissions as provided by the Manufacturer's Representative Agreement. Varo urged that Kross' right to any commissions is controlled by the agreement and a supplemental agreement executed between the parties which required receipt of sales price by Varo from purchases or leases. Varo says payments were not made, therefore, Kross was not entitled to commissions. Varo further maintained that the transactions, contemplated by the purchase orders and lease agreement, without fault on its part, were not consummated because of the unreadiness, unwillingness and the inability of the purchasers and lessee to perform.

A jury trial resulted in a judgment favoring Kross in the sum of $416,649.44, together with interest and costs. Varo has appealed.

The Manufacturer's Representative Agreement consisted of sections and numbered and unnumbered paragraphs. Section A provided for the appointment of the representative, his territory, the products and services covered by the agreement and their prices and terms; the limit of the representative's authority and his commitment to the company. Section C provides for the duration and termination of the agreement and Section D consisted of four numbered paragraphs dealing with miscellaneous matters.

Section B set forth the agreement regarding the payment of commissions. Numbered paragraph 3 in this section provided for the designation of certain "home accounts" to which the representative was not entitled to commission. Paragraph Number 4 established the method of payment of commission in the event of cash sales or credit sales. The controlling paragraphs are numbered 1 and 2 in this section and read:

"1. Varo shall pay Representative, as the exclusive compensation for Representative's services hereunder, commissions upon all sales for which Representative is responsible for in the territory and subject to the other terms and conditions, set forth herein. All Varo sales resulting from the acceptance of orders written or otherwise placed from within Representative's territory shall be presumed to have been originated by Representative; provided however, Varo reserves the right to divide equitably the commission applicable to individual sales between Representative and one or more other representatives in the event Varo determines, in its sole discretion, that more than one representative contributed substantially to the origination of such sale.

2. Representative shall be entitled to a *10%* commission of the invoice sales price received by Varo. Commissions shall be computed on the net amount of Varo's invoice to the purchaser, after deducting all sales and use taxes, trade discounts, rebates, returns, allowance, insurance, transportation charges, attorney and legal fees, and unusual costs of collection."

On the same day that the Manufacturer's Representative Agreement was executed, the parties executed a Supplemental Agreement which stated:

"Per our agreement in the meeting of March 11, 1971 and subsequent meetings the morning of March 12, 1971, it was agreed that when Varo and Robert Huebscher agree on the terms and conditions of the Manufacturer's Representative Agreement attached hereto the fol-

lowing becomes effective as supplemental thereto:

1. You will receive full commissions per Manufacturer's Representative Agreement for the following accounts which are presently under negotiation if sales are completed while the Manufacturer's Representative Agreement is in effect:

A. Cool Enterprises Inc.,
   Las Vegas, Nevada    24 Units

B. Cool Enterprises,
   Phoenix, Arizona    24 Units

C. Auto Vend-Ramah,
   Van Nuys, Calif.    24 Units

D. For the account of forty-eight (48) machines presently at (or on location) Auto Vend, Van Nuys, it was agreed that you will receive payment of $4,000 when Varo receives total sales price in lieu of any other commission payments.

E. You will likewise receive your accrued vacation.

F. You will be allowed to continue the hospitalization and life insurance program as now exists up through September 30, 1971. A letter is forthcoming from Fred Harris with further details.

This agreement shall be supplemental to the Manufacturer's Representative Agreement and shall supersede and cancel any previous understanding or agreement, formal, informal, express or implied between the parties and together with the Manufacturer's Representative Agreement contains the entire understanding of the parties."

The record reflects that Kross had been an employee of Varo since 1968. In December of 1969 he was transferred within the company becoming a sales representative with the automatic vending division. He was paid a regular salary and received reimbursement of all expenses incurred in connection with his employment. This arrangement continued until March 16, 1971, when the Representative's Agreement and the Supplemental Agreement were executed.

Prior to the execution of these two agreements, Kross as an employee and at Varo's instructions had negotiated with Ramah Marketing Corporation, Kool Enterprises, Inc., and Carl Combs, dba Kool Enterprises, in an effort to sell or lease vending machines to them. On March 16, 1971, Ramah Marketing Corporation executed a purchase agreement which was supplemented by a letter agreement dated March 19, 1971, agreeing to purchase 1,523 vending machines from Varo. On March 17, 1971, Kool Enterprises Inc., executed a purchase order agreeing to purchase 200 machines and Carl Combs, dba Kool Enterprises, signed a lease agreement for 24 vending machines. These transactions are the basis of Kross' claim for commissions.

The record reflects that Ramah Marketing Corporation delivered a $5,000 check drawn on the account of Auto Vend of Santa Monica as a down payment for the machines purchased by it. The check was deposited by Varo and returned by the bank marked "nonsufficient funds." No other payment was ever received by Varo from Ramah Marketing Corporation. After the execution of the purchase and lease agreements, a settlement and mutual release was entered into between Varo and Kool Enterprises, Inc. and Carl Combs, dba Kool Enterprises, under the terms of which the parties released each other from their obligations under the purchase and lease agreements. Varo was paid the sum of $5,988 by Carl Combs, dba Kool Enterprises, under the lease agreement.

Both Kross and Varo pleaded that the Representative's Agreement and the Supplement thereto is unambiguous and should be construed to support their respective positions. Alternatively, each pleaded that the instruments are ambiguous.

Our Supreme Court in City of Pinehurst v. Spooner Addition Water Co., 432 S.W.

2d 515 (Tex.Sup.1968), stated: "It is elementary that if there is no ambiguity, the construction of the written instrument is a question of law for the court. Myers v. Gulf Coast Minerals Management Corp., 361 S.W.2d 193 (Tex.Sup.1962)."

In determining whether a contract was ambiguous or not, the court in Universal C. I. T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154 (1951), stated:

"In a fairly recent case this court said that 'if a written contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous.' . . . The converse of this is that a contract is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning . . . In other words, if after applying established rules of interpretation to the contract it remains reasonably susceptible to more than one meaning it is ambiguous, but if only one reasonable meaning clearly emerges it is not ambiguous. In the latter event the contract will be enforced as written and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from what which its language imports . . . Neither in this latter event may the rule of strong construction against the author be invoked. That rule is applied only where a contract is open to two reasonable constructions . . . In 12 Amer.Juris., at page 796 it is said: 'The rule that expressions will be interpreted against the person using them applies only where, after the ordinary rules of interpretation have been applied, the agreement is still ambiguous.'

In the interpretation of contracts, whether they be ambiguous in the sense that that term is here defined or simply contain language of doubtful meaning, the primary concern of the courts is to ascertain and to give effect to the true intention of the parties. To achieve this object the courts will examine and consider the entire writing, seeking as best they can to harmonize and to give effect to all the provisions of the contract so that none will be rendered meaningless."

■ A careful examination and consideration of the entire writing, giving full effect to all the provisions of same in an effort to determine the true intention of the parties, leads to but one conclusion; the agreement is so worded that it can be given a certain, definite interpretation, therefore, it is not ambiguous.

The parties by the contract agreed that "Representative shall be entitled to 10% commission of the invoice *sales price received by Varo*." (emphasis added) The trial court was in error in denying Varo's motion for an instructed verdict.

Should we be in error in holding that the contract is not ambiguous, Varo's contention that the trial court erred in disregarding the jury's answers to certain special issues must be examined.

As stated in Trinity Universal Insurance Co. v. Ponsford Brothers, 423 S.W.2d 571 (Tex.Sup.1968):

"A jury may not be called upon to construe the legal effect of an instrument. Knutson v. Ripson, 163 Tex. 312, 354 S.W.2d 575 (1962); Burgess v. Sylvester, 143 Tex. 25, 182 S.W.2d 358 (1944). The jury may, however, resolve an ambiguous intent, and the issue asked about intent as a fact issue. Skelly Oil Co. v. Archer, [163 Tex. 336, 356 S.W.2d 774] supra; Ellisor v. Kennedy, 128 S.W.2d 842 (Tex.Civ.App.1939, writ ref.)."

The issues disregarded by the court and the jury's findings are as follows:

" SPECIAL ISSUE No. 7

Do you find from a preponderance of the evidence that the true intention of the parties was that the Plaintiff earned

his commission when he produced an order which was accepted by the Defendant?

Answer: 'Yes,' or
'No.'

ANSWER: No."

"    SPECIAL ISSUE NO. 20

Do you find from a preponderance of the evidence that it was the true intention of the parties that Plaintiff would be paid a commission only on 24 machines in connection with the Purchase Order between Defendant and Ramah Marketing Corporation?

Answer yes or no.

ANSWER: Yes.

SPECIAL ISSUE NO. 21

Do you find from a preponderance of the evidence that it was the true intention of the parties that Plaintiff would be paid a commission only on 24 machines in connection with the Purchase Order between Defendant and Kool Enterprises, Inc.?

Answer    yes or no.

ANSWER: Yes

SPECIAL ISSUE NO. 22

Do you find from a preponderance of the evidence that it was the true intention of the parties that Plaintiff would be paid a commission only on 24 machines in connection with the Lease Agreement between Defendant and Carl Combs d/b/a Kool Enterprises?

Answer    yes or no.

ANSWER: Yes."

Before a trial court may disregard jury's answers to special issues it must follow the rule as stated by our Supreme Court in Harbin v. Seale, 461 S.W.2d 591 (Tex. Sup.1970):

"The law is clear in this state that before a trial court can render a judgment non obstante veredicto, based on the absence of evidence, it must determine that there is no evidence having probative force upon which the jury could have made the findings relied upon. Whiteman v. Harris, 123 S.W.2d 699 (Tex. Civ.App.—Fort Worth 1938, writ ref'd). In making this determination, all evidence must be considered in a light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference deducible from the evidence is to be indulged in such party's favor. Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194 (1952)."

See also Robertson v. Alberty, 499 S.W.2d 361 (Tex.Civ.App. Amarillo 1973, no writ hist.); Mitchell v. Porter, 349 S.W.2d 785 (Tex.Civ.App. Houston 1961, writ ref. n. r. e.); Rule 301, Texas Rules of Civil Procedure.

The documentary evidence, the testimony of Robert Day, and other facts and circumstances in evidence constitutes some evidence, the parties intended the payment of commission only on receipt of the sale price by Varo. The supplemental agreement limited the commission to be paid, in the event of a sale to the three entities, to twenty-four machines each. This is some evidence the parties intended a commission to be paid only on twenty-four machines in connection with the transaction between Varo and the third parties.

■ If we are in error, and the contract is ambiguous, then the trial court was in error in disregarding special issues number 7, 20, 21 and 22.

The jury in response to an inquiry as to the sum of money paid to Varo in connection with the lease agreement with Carl Combs dba Kool Enterprises answered $5,988. They also found that neither Kool Enterprises or Ramah Marketing Corpora-

724

tion paid Varo any money in connection with the purchase orders. If we are correct in our holding that the contract is unambiguous, Kross is entitled to the sum of $598.80 as commission. Likewise, if the contract is ambiguous the improperly disregarded jury findings would entitle Kross to the same amount.

By cross-point, Kross contends that the trial court erred in not awarding attorneys fees. He did not except to such action by the trial court nor did he raise such question in that court. He gave no notice of appeal and none was perfected. Under such circumstances the cross-point of Kross cannot be considered by this court. West Texas Utilities Company v. Irvin, 161 Tex. 5, 336 S.W.2d 609 (Tex.Sup. 1960); Aetna Casualty and Surety Co. v. Glidden Company, 283 S.W.2d 440 (Tex. Civ.App. Eastland 1955, 155 Tex. 591, 291 S.W.2d 315).

Under our disposition of the case, we do not pass on the other points of error. The judgment is reformed to award Robert Kross the sum of $598.80 together with interest and costs and as so reformed is affirmed.