**VERMILLION CONSTRUCTION COMPANY, Appellant,**

v.

**FIDELITY & DEPOSIT COMPANY OF MARYLAND, Appellee.**

No. 976.

Court of Civil Appeals of Texas, Corpus Christi.

Aug. 29, 1975.

Thomas M. Andrews, Ellis, Andrews & Lawrence, Inc., Aransas Pass, Lee Mahoney, Corpus Christi, Burt Ballanfant, New Orleans, La., for appellant.

Richard A. Hall, Branscomb, Gary, Thomasson & Hall, Corpus Christi, for appellee.

## OPINION

NYE, Chief Justice.

This case involves a claim by a subcontractor against the general contractor for payment of extra work performed. The subcontractor's bonding company, Fidelity & Deposit Company of Maryland brought suit originally for a declaratory judgment against various defendants, including the general contractor and its bonding company, Aetna Casualty & Surety Company, for a declaration as to the amount and validity of the claims of various defendants, including the subcontractor CRM Contractors, Inc. for which Fidelity might be liable. Fidelity sought a determination of whether there existed in fact an oral agreement between CRM and the general contractor that would require the general contractor to pay additional compensation for the extra work done by CRM.

Trial was before a jury which answered certain special issues in favor of the subcontractor CRM. The jury found that there was a subsequent oral agreement entered into between CRM and the general contractor Vermillion Construction Company (hereinafter called Vermillion) whereby Vermillion would pay CRM a reasonable price for doing the extra work. The jury found that $18,093.00 was a reasonable sum for the extra work. Vermillion and its bonding company Aetna have duly perfected their appeal to this Court.

The construction site upon which the subject of the controversy arose is known as the "Harbor Oaks Subdivision" and is located near Rockport, Aransas County, Texas. The owner of the land was Canoe Lake Corporation. The engineer on the job was Urban Engineering. The project site was ultimately to consist of a venetian type water oriented subdivision with three (3) peninsulas or fingers of land extending from the shoreline into a salt water lake. Upon each of the peninsulas, lots were to be located around the edge with a street down the middle. Around the edge of the three peninsulas were to be placed concrete bulkheads. Between the peninsulas the water was dredged and the spoil was placed on the peninsulas. This accomplished two purposes: to deepen the water and to provide for some fill material on the subdivision site. Vermillion, who specialized in concrete bulkheads, was awarded the contract for a total bid of $292,191.06 for the water front and lot improvements.

Thereafter, Vermillion entered into a subcontract with CRM to do a portion of the work relating to the building of streets, curbs, gutters and to grade and level the lots within the subdivision. CRM's bid was $61,589.62. Prior to the subcontract being entered into between Vermillion and CRM, Mr. Charles Vermillion and Mr. Charles McGuire, (the principal owner of CRM) visited the project site in order to examine the area and to describe CRM's subcontract work. While at the project site, their discussion centered around problems which might be encountered by CRM in leveling and grading the lots. One problem discussed in particular was the necessity of obtaining sufficient dirt to raise the lots to the proper height in case some of the lots settled to an elevation below that required by the plans and specifications. The three peninsulas which were formed were made up of hydraulic fill material which in essence was dredged material. This material has a tendency to settle after being compacted. Once the fill material has become compacted, it would require additional dirt placed on top of it to bring it to the required elevation. CRM's main concern in determining its bid amount was whether the dirt removed from the excavation of streets would be sufficient to compensate any settling of the land. After reviewing the job site, McGuire and Vermillion both agreed that the dirt removed from the street would be in sufficient quantity to take care of any settling of the lots. At the pre-bid conference which was attended by Vermillion, the owner, and the engineer, the subject of the fill material was again discussed. It was anticipated that the fill material would settle to such an extent that

approximately 14,000 to 16,000 cubic feet of dirt would be required to raise the lots to the required elevation. It was the consensus of those in attendance that the surplus dirt from the excavation of the streets would be sufficient to take care of the settling.

CRM then moved onto the job site and began job operations. Within a week after CRM had moved onto the job site, it was discovered by Vermillion that the required length and width of each of the peninsulas in question were too short and did not conform to the plans and specifications. Vermillion determined that additional dirt was necessary to extend the peninsulas so that they could get their machinery out far enough to install the concrete bulkheads in the water. After some of the bulkheads were placed in the water at their correct locations, they were a considerable distance from the peninsula land area. It was then discovered that it was necessary to bring in additional dirt to extend the peninsula shoreline to the bulkheads.

In order to alleviate this problem, Vermillion instructed CRM to haul the dirt which was removed from the street excavation to the end of the peninsula for the purpose of filling in and extending the length of such lots. CRM objected to this for the reason that if they were required to use the dirt that was removed from the street excavation, they would not have sufficient dirt for leveling and grading the lots to the required elevation as required in CRM's subcontract. CRM stated that supplying this additional dirt to extend the peninsula area to the bulkheads was not a part of their job under their contract.

After some discussions, Vermillion agreed with CRM that the hauling of dirt to be placed at the end and the sides of the peninsulas was not a part of CRM's contract. Therefore, Vermillion wrote a letter to Urban Engineering concerning the dirt shortage. The letter reads in part as follows:

"As you know at the pre-bid conference, the subject, 'Settling of Fill Material', was an item of discussion. Therefore, after the conference we anticipated a settlement of fill area to the extent of approximately 14–16000 cu. yds., to be obtained from excavation of street and other areas above specified grades. We have moved this dirt and placed it, not on the lots, as stated at pre-bid conference, because of settling of material, but on the ends of the fingers where the water ranged from –8' to –9½' deep at the bulkhead line, 18' – 30' out from waters edge. None of the shortage of length or over cutting was mentioned at the conference. None of the other bidders anticipated it would be necessary to measure the length at the fingers or verify any other widths or lengths on the plans. We certainly didn't."

CRM contended that an oral agreement was then reached between CRM and Vermillion whereby Vermillion agreed to pay or see to it that CRM was paid for the additional work on the cost plus profit basis. Vermillion denies that any such oral agreement was ever entered into between it and CRM. In the meantime, CRM began removing the dirt from the street excavation for the purpose of extending the peninsulas to the bulkheads. Finally, CRM sent a detailed invoice to Vermillion which included the charges for the additional extra work in the amount of $18,093.00. Vermillion refused to pay any part of the charges claiming that there never was any agreement between it and CRM to do the additional extra work.

After CRM had performed its subcontract, there were various materialmen and suppliers of CRM who were making claims for unpaid bills. It was then that Fidelity instituted this suit in the nature of a declaratory judgment against the general contractor, the various suppliers and materialmen and CRM seeking a declaration as to who was entitled to recover payments from CRM. Fidelity also sought a determination of whether there was an oral agreement to

the effect that Vermillion would pay CRM for the extra dirt work in extending the peninsula areas.

After numerous stipulations by the parties, the case was tried upon the question of whether or not CRM reached an oral agreement with Vermillion for the extra work and if so, the amount of money CRM was due for such additional work.

Trial was before a jury. It found that: 1) Vermillion Construction Company required dirt from the fingers of the project to be used to extend such fingers to the bulkhead line for distances up to thirty feet and in water up to nine and a half feet in depth; 2) use of such dirt for purpose of extending the finger caused a shortage of dirt on the project which required additional dirt to be hauled in order to bring the lots to grade; 3) that at the time of the execution of the contract between CRM and Vermillion the parties thereto did not intend that the contract requirement of bringing the lots to grade might include the use of such dirt for the purpose of extending the fingers; 4) that Charles Vermillion told Charles McGuire that Vermillion Construction Company would pay for the hauling of additional dirt required to bring the lots to grade; 5) that CRM hauled the additional dirt required to bring the lots to grade; and 6) that the reasonable value of the work performed by CRM in hauling the additional dirt was $18,093.00.

Vermillion brings forward five (5) points of error on appeal. In its first two points, Vermillion asserts that the trial court was in error in overruling its motion for instructed verdict because the alleged oral contract encompassed work which was included in the original contract as a matter of law and that there was no evidence that there was a meeting of the minds of the parties and no evidence that there was an acceptance of the alleged terms of the oral contract.

At the close of the plaintiff's evidence, Vermillion filed its motion for instructed verdict which was overruled by the trial court. The defendant Vermillion then proceeded with the evidence concerning its defense.

In reviewing the refusal of a trial court to grant a motion for instructed verdict, the appellate court must disregard all evidence adverse to the non-moving party and give credit to all evidence favorable to said non-moving party. The appellate court should indulge any legitimate inference favorable to the non-movant. *Shoppers World v. Villarreal,* 518 S.W.2d 913 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n. r. e.); *Hardware Mutual Casualty Company v. Brown,* 390 S.W.2d 53 (Tex.Civ.App.—San Antonio 1965, writ ref'd n. r. e.); *Leach v. Leach,* 208 S.W.2d 618 (Tex.Civ.App.—Galveston 1948, writ ref'd n. r. e.); 3 McDonald Texas Civil Practice, § 11.28.2 (1970).

Reviewing the evidence most favorable toward the non-moving party CRM, we find from the record that CRM's owner, Charles McGuire, testified that the dirt from the street excavation was intended to be used for the leveling of the lots in case the dredge material settled. He stated that instead of this use, it was used to extend the peninsula areas out to the bulkheads which were installed by the general contractor. Vermillion agreed that the filling in at the end and at the edge of the peninsula areas from the waters' edge to the bulkheads was something that was not called for in the overall contract that Vermillion had entered into with the owner. He stated that it was not considered by him in making his bid to the owner. It was Vermillion's contentions that it was the dredger's job to have built the peninsula areas to the proper dimensions. Vermillion stated that the plans and specifications did not call for the filling of up to eight to nine feet of water with dirt from the project site. It was undisputed that the lack of dirt at the end and the edge of the peninsula areas was not due to any settling, but was because there was insufficient dirt there to begin with.

McGuire testified that Mr. Vermillion told him that this additional dirt would have to be hauled in so that Vermillion could get its dragline out to the end of the peninsula area so as to build the bulkheads. When CRM objected, Vermillion told CRM to go ahead and haul the additional dirt and not to worry about it, that Vermillion would pay CRM for the additional work in addition to that which was required and called for under CRM's contract. That the agreed price on the extra dirt would be CRM's costs plus profit. McGuire testified that if he had not had such an agreement with Vermillion, he would not have done the extra work and that Vermillion would have been required to hire someone else and pay them for the additional work.

A Mr. Gene Graham, a licensed engineer working for CRM, testified that he was present at the discussions between Vermillion and McGuire in which Vermillion agreed with McGuire that the hauling of the dirt was not a part of CRM's contract. Graham testified that at one of these meetings, Vermillion told McGuire "that somehow we would—should, or—or would be paid for it."

Vermillion contends in its brief that the plans and specifications outlining the dirt work subcontracted shows that the amount of dirt that was encompassed in the contract included the extra dirt. On page 17 of the plans and specifications, there is this note: "Lots to be graded as shown. No separate payment for excavation or lot grading. The cost thereof shall be included in contract prices bid for the item of which this work is a component." However, when we look at the evidence most favorable toward CRM, it shows that this provision pertained only to the dirt that might be necessary to bring the lots up to grade because of the settling of the dredge material. It was undisputed, and all the witnesses testified, that the lack of dirt at the end of the peninsula areas was not due to settling. It just had not been there in sufficient quantity to begin with.

It was clear that Vermillion's promise to pay CRM extra compensation was not for the purpose of inducing CRM to do what it had already agreed and was bound to do, but was to get CRM to do something in addition that was not covered by its contract. We hold that there was ample evidence that would require the trial court to overrule Vermillion's motion for instructed verdict.

■ There appears to be a further reason for overruling appellant's first two points of error. The appellate courts have held that where a defendant moves for a directed verdict at the close of plaintiff's evidence (as was the case here), and such motion is overruled by the trial court, the defendant by proceeding with the evidence waives his motion. *Shoppers World v. Villarreal,* supra; *Texas Construction Rentals, Inc. v. Harrison,* 410 S.W.2d 482 (Tex.Civ. App.—Waco 1966, writ ref'd n. r. e.); *Jackson v. Jackson,* 470 S.W.2d 276 (Tex.Civ. App.—Fort Worth 1971, writ ref'd n. r. e.); *Edelstein v. Lehmann,* 452 S.W.2d 49 (Tex. Civ.App.—San Antonio 1970, writ ref'd n. r. e.); *Robb v. Gilmore,* 302 S.W.2d 739 (Tex. Civ.App.—Fort Worth 1957, writ ref'd n. r. e.); 3 McDonald, Texas Civil Practice, § 11.-26 (1970). Appellant's points of error 1 and 2 are overruled.

■ In appellant's third point of error, it contends that the court erred in submitting special issues, or any of them, to the jury for the reason that the written contract between Vermillion Construction Company and CRM Contractors, Inc. was not vague or ambiguous as a matter of law.

The question of whether a contract is vague or ambiguous is one of law and not of fact. *Ferguson v. von Seggern,* 434 S.W.2d 380 (Tex.Civ.App.—Dallas 1968, writ ref'd n. r. e.); *Davis v. Andrews,* 361 S.W.2d 419 (Tex.Civ.App.—Dallas 1962, writ ref'd n. r. e.). If the contract is not clear and is subject to more than one construction, it is the duty of the trial court to submit that matter to the jury for their determination upon the testimony as pro-

duced by the parties. *Trinity Universal Insurance Company v. Ponsford Brothers,* 414 S.W.2d 16 (Tex.Civ.App.—El Paso 1967), 423 S.W.2d 571 (Tex.Sup.1968); 13 Tex.Jur.2d, Contracts § 110; 17A C.J.S. Contracts § 520.

The subject written contract, dated May 6, 1969, between Vermillion and CRM was basically a form contract with no specific provisions for job description. The contract refers to "exhibit A" which was CRM's bid sheet showing only the quantities and prices of material and labor upon which CRM based its bid. The contract also makes reference to the plans and specifications generally. There was nothing in the contract with CRM which would indicate one way or the other that the hauling of dirt for the purpose of extending the fingers was within CRM's contract with Vermillion.

In this case the intention of the parties as to what and how much dirt was to be hauled and where and for what purposes was unclear. It was necessary to obtain testimony from the parties so that their intentions could be ascertained. Since the contract was ambiguous, the issue as to its true meaning was one of fact for the jury. See *Ellisor v. Kennedy,* 128 S.W.2d 842 (Tex.Civ.App.—Galveston 1939, writ ref'd). Appellant's point of error 3 is overruled.

■ Vermillion's last two points of error concern only the damages awarded to CRM. Vermillion in its forth point of error complains that the jury's finding of $18,093.00 is grossly excessive because there is no evidence that Vermillion agreed to pay or was responsible "for any amount in excess of $10,856.00." In its fifth point, Vermillion asserts it is not liable for $7,237.00 (difference between $18,093.00 and $10,856.00) because the undisputed evidence shows that Vermillion did not cause the loss of the excess of $7,237.00 by CRM, but such loss was caused by the actions of Canoe Lake Corporation.

Appellant bases its complaint on the wording used in CRM's invoice. In that invoice, prepared by Gene Graham, the en-gineer associated with CRM on the Harbor Oaks project, it was stated that approximately ⅓ of their costs for the extra work ($7,237.00) was due to:

"(a) The closest and best material in the Borrow Source should have been available to us but was going to bridge contractor.

(b) Denial of other parts of borrow source.

(c) Lack of cooperation of owner to permit use of other available borrow sources."

Be that as it may, the evidence was sufficient to support the jury's verdict that $18,093.00 was the reasonable value of the work performed by CRM in hauling the additional dirt.

In CRM's invoice to Vermillion, CRM calculates the price for the extra work. Mr. Graham calculated the total cost of hauling dirt during the six weeks period in question as being $28,319.00. He attributed one third of this total cost, $9,440.00, to the work involved in extending the peninsula area and then added 15% profit to arrive at a total of $10,856.00. Appellant does not make any complaints as to this amount. He then calculated that an additional ⅓ of the remaining cost should also be attributed to extra work because Vermillion's requirement that the dirt from the excavation of the streets be used to fill and lengthen the peninsula area created the dirt shortage. Such shortage occurred to CRM because CRM had depended on using the dirt from the street excavation for leveling and bringing the lots up the required elevation. It was agreed that the dirt from the street would be sufficient to take care of any settling that might occur. This dirt from the street excavation was also very close to the lots, thus requiring very little hauling. Once this dirt was gone (after being put on end of peninsula area), CRM was forced to obtain dirt elsewhere at a greater expense. Mr. Graham calculated this additional cost to be $6,293.00, added a profit of $944.00 amounting to $7,237.00 and when combined

with the $10,856.00 results in a total cost of additional dirt work of $18,093.00. By Vermillion's request that CRM use the dirt from the street excavations for the purpose of extending the fingers, Vermillion caused the problem and the extra expense CRM was faced with in finding additional dirt to be used for leveling the lots. In the process of doing the additional work, CRM had to make longer hauls in order to obtain the additional dirt. This caused their overhead and other expenses to increase. This was still the work which Vermillion had agreed to pay for on the basis of CRM's cost plus profit.

After considering all the evidence, we hold that there was ample evidence before the jury which would support the jury's finding that the reasonable value of CRM's work in hauling the additional dirt was $18,093.00 and that Vermillion was responsible for the $7,237.00 included in that figure. Appellant's points of error 4 and 5 are overruled.

Fidelity & Deposit Company of Maryland (as cross-appellant) bring forward one point of error. However, in its brief, Fidelity says:

"Cross-appellant Fidelity & Deposit Company of Maryland is content with the judgment entered by the trial court. Its appeal is conditioned in nature. It seeks relief here only in the event that this court reverses the judgment of the trial court at the instance of appellant Vermillion Construction Company and remands the case for further proceedings."

In view of the disposition of this case, it is unnecessary to pass upon the cross-appellant's point of error.

The judgment of the trial court is affirmed.