Ronald J. MONESSON, Appellant,

v.

CHAMPION INTERNATIONAL CORP., DEL-MAR DIVISION, Appellee.

No. 971.

Court of Civil Appeals of Texas, Tyler.

Dec. 2, 1976.

Rehearing Denied Dec. 30, 1976.

Joe B. Harrison, Daniel J. Sheehan, Jr., Wynne & Jaffe, Dallas, for appellant.

Lester L. May, Kenneth A. Herridge, May, Troy & Block, Dallas, for appellee.

McKAY, Justice.

This is a contract case. Suit was instituted by appellee, Champion International Corporation, Del-Mar Division (Del-Mar), against Ronald J. Monesson (Monesson) for failure to pay for cabinets manufactured, sold and delivered under a contract to Monesson for a housing project known as "Chimney Hill Townhomes". Monesson answered and filed a counterclaim alleging that Del-Mar breached a contract between the parties by failing and refusing to deliver cabinets for all 420 units in the project at the agreed price and thereby caused him to suffer damages in excess of those claimed by Del-Mar. Del-Mar's first amended petition, upon which it went to trial, pled in the alternative, in quantum meruit, and attached exhibits of the contract in question alleging that Monesson had agreed in writing to pay attorney's fee. A stipulation was entered into by the parties that judgment should be rendered in favor of Del-Mar for $18,167.09 for cabinets delivered but not paid for, together with attorney's fee of $2,500.00 in the event the court determined Del-Mar was entitled to attorney's fee. Trial was then had on Monesson's counterclaim before a jury, and a verdict was returned favorable to Monesson. The trial court granted Del-Mar's motion for judgment non obstante veredicto and rendered judgment for Del-Mar in accord with the stipulations, which included the attorney's fee. Monesson brings this appeal on three points.

In 1971 Monesson, a real estate builder and developer, decided to construct a townhouse project in North Dallas. The plan contemplated a four-phase development eventually resulting in the construction of a total of 420 townhouses. Monesson began accepting bids from various materialmen. Lestingi, a sales representative of Del-Mar, submitted to Monesson a written bid or proposal dated April 6, 1972, on a printed form. The proposal referred to the project and offered to supply various styles of cabinets at certain set prices, although no specific quantity was mentioned other than the reference to the "420 UNIT TOWNHOUSE PROJECT—CHIMNEY HILL". The proposal also had the term "Prices are subject to change without notice." Del-Mar being the successful bidder, Monesson and Del-Mar's sales representative, Joe Lestingi, both signed the proposal offered by Del-Mar, the result of which is the agreement which is the subject of dispute in this case.[1] Subsequently on January 3, 1973, Monesson was requested to and did sign a proposal essentially identical to the one he had previously signed, because as the testimony showed, Lestingi wanted to confirm the previous agreement for phases 3 and 4. The January 3, 1973, instrument, on the same form, had the language "420 UNIT TOWNHOUSE PROJECT—CHIMNEY HILL—PHASE 3 & 4," and in the subject to acceptance blank had "30" days. On January 18, 1973, another proposal on the same form was signed by Monesson and Larry Walls for Del-Mar which was designated "Addendum to Bid Dated January 3, 1973; 420 Unit Townhouse Project—Phase 3 & 4," which added another model cabinet.

1. See exhibit on following page.

*Phone* 661-0601

A DIVISION OF U.S. PLYWOOD · CHAMPION PAPERS INC.

2865 GORDON ROAD, N. W.    TELEPHONE 404-691-7660
ATLANTA, GEORGIA 30311

fine
furniture
cabinets for
kitchens
&elsewhere.

Order No._____  Date  APRIL 6, 1972

Invoice To____ ~~BOB~~ MONESSON & Company    Address  Street ____  City  DALLAS, TEXAS ____

Ship To_____  Address  Street ____  City_____

Legal Description of Property_____

Legal Property Owner_____  Address_____

Specifications of material to be furnished: DEL-MAR STANDARD SIZES AND SPECIFICATIONS, FACTORY FINISHED CABINETS AS SHOWN ON ATTACHED SKETCH, ESTIMATES SHEET, AND AS FOLLOWS:

Class Cabinet_____  Hardware_____  Plastic · Vinyl · Maple · Tops — Sink · Ours · Theirs —
Sink Rims · Ours · Theirs — Fittings · Ours · Theirs

420 UNIT TOWNHOUSE PROJECT — CHIMNEY HILL

We propose to furnish and install our prefinished wooden kitchen cabinets and matching vanity cabinets. Kitchen tops will be plastic 1 1/2" drop-edge with standard 4" backsplashes. Vanity tops will be manufactured marble with marble bowls.

Priced in styles as indicated below, and per attached drawings:

| TYPE | OVERTURE | TOWN CLASSICAL | ENCORE PECAN |
|------|----------|----------------|--------------|
| 101 | $653.28 | $746.41 | $783.75 |
| 102 | $739.91 | $851.60 | $896.28 |
| 103 | $1005.97 | $1125.60 | $1204.27 |
| 104 | $938.14 | $1063.43 | $1135.53 |
| 105 | $1141.11 | $1300.07 | $1363.66 |
| Rec. Room | | $1060.62 | |

This bid does not include sinks, rims, bar sinks, or linen fronts.
~~Sales tax to be added where applicable.~~

For the total amount of_____  $_____

Payable_____ F.O.B._____  Approximate Delivery_____    Sales Tax_____

Our shop details must be approved within 10 days after date of drawing.    Total $_____

PRICE INCLUDES ONLY ITEMS ENUMERATED ABOVE
Subject to acceptance within 60 days by an authorized officer of this Company. Prices of other items shown on this sketch quoted upon request. Prices subject to change without notice. Errors and omissions excepted. All agreements subject to delays beyond our control. Installation of all materials by others unless otherwise specified. Counter tops and Sink tops are made with a tolerance of 1/8 inch.

Accepted in duplicate by:  IN THE EVENT IT SHALL BE DEEMED NECESSARY TO PLACE THIS

Purchaser_____  ~~PURCHASE AGREEMENT IN AN ATTORNEY'S FOR COLLECTION~~

ATTORNEY'S FEE AND ALL COSTS INCURRED IN THE COL-
LECTION INCLUDING ANY COSTS ATTENDANT TO FILING A
MECHANIC'S LIEN

By_____

Signature of the Purchaser sworn to and subscribed before me this _____ day of _____

_____ Notary Public

PLEASE NOTE ADDITIONAL TERMS OF NOTES ON REVERSE SIDE

Respectfully submitted,

Del-Mar Division

By_____
JOE LESTINGI

PLAINTIFF'S EXHIBIT

---

Del-Mar had Lestingi to request Monesson to accept a three per cent (3%) increase in price, but Monesson refused. Del-Mar continued providing cabinets until late in 1973, when, after Lestingi had left the employ of Del-Mar, another of its sales representatives asked Monesson to "renegotiate" the contract by accepting approximately a thirty-three per cent (33%) price increase. Monesson refused the price increase; and on January 1, 1974, Del-Mar stopped shipping cabinets to Monesson. Monesson

wrote Del-Mar on January 11, 1974, demanding that it honor the terms of the contract. Del-Mar replied by letter dated March 1, 1974, informing Monesson that it considered his failure to accept the price increase to be a breach of contract. This was followed by another letter to Monesson, dated March 7, 1974, from Del-Mar's New York counsel, Stephen Brown, stating that Monesson was guilty of breach of contract and if Monesson obtained his cabinets elsewhere "We intend to include in our claim all losses suffered by Del-Mar" as a result of Monesson's failure to perform under the contract. Del-Mar's refusal to supply the remaining cabinets to Monesson at the contract price resulted in Monesson's making a contract with another cabinet supplier for the remaining units, at a cost of approximately $63,000 more than the price agreed to by Del-Mar.

Monesson testified that prior to the 3% price increase request Del-Mar, through its chief executive officer Fisher, refused to give Monesson a requested three per cent (3%) advertising allowance on the ground that the contract fixed the prices to be charged for the entire development. Monesson also testified that Del-Mar had supplied cabinets to him for several previously built projects, and that the same contract form was used on each of them and that Del-Mar had never asked for a price increase on any other project. He testified that Del-Mar made him a proposal through their representative, Lestingi, and that he accepted it by signing it as he had all the others, and that it was his intention that the agreement was for the entire 420 units at fixed prices. Monesson further testified that the language "Prices subject to change without notice" was intended to apply so long as it was a proposal, but after he accepted the proposal it meant "We had a firm contract and I was entitled to rely upon those prices throughout the development and Del-Mar was entitled to rely upon my purchasing from them at those prices."

Lestingi, Del-Mar's sales representative, testified that it was his intention that the contract prices were fixed for the entire 420 units from time of Monesson's acceptance, and that Del-Mar's prices were based on the fact that Del-Mar bid on the entire 420 units, and that it was Del-Mar's intention to give Monesson a commitment to supply the 420 units at the fixed prices set out in the contract. Also introduced was evidence of custom and practice in the building industry to the effect that offers to sell are made by proposals or bids, and that once a proposal is accepted by both parties, it is binding on both as to quantity and the prices become fixed.

Del-Mar objected to the testimony of Monesson and Lestingi on the ground that such evidence was a violation of the parol evidence rule and was an attempt to vary the terms of a written contract. The jury found in Special Issue Number One that the contract was for cabinets for all of the 420 townhouses; and in Special Issue Number Two, that the prices were fixed, according to the proposal, for the whole term of the contract.[2] The trial court granted judgment notwithstanding the verdict on the

2. SPECIAL ISSUE NO. 1:
"Do you find from a preponderance of the evidence that in executing Plaintiff's Exhibit 1, as supplemented by Plaintiff's Exhibit 3, that Monesson and Del-Mar mutually intended that Plaintiff's Exhibits 1 and 3 were to cover the entire 420 units of Chimney Hill Townhome project?
"Answer 'Plaintiff's Exhibits 1 and 3 were intended to cover the entire project.'
OR
'Plaintiff's Exhibits 1 and 3 were not intended to cover the entire project.'
"ANSWER: 'Plaintiff's Exhibits 1 and 3 were intended to cover the entire project.
SPECIAL ISSUE NO. 2:

"Do you find from a preponderance of the evidence that in executing Plaintiff's Exhibit 1, as supplemented by Plaintiff's Exhibit 3, that Monesson and Del-Mar mutually intended that the kitchen and vanity cabinets prices which appeared thereon were fixed prices which would apply for the duration of the entire Chimney Hill Townhome project?
"Answer 'They intended that the prices were fixed for the entire project.'
OR
'They did not intend the prices would be fixed for the entire project.'
"ANSWER: 'They intended that the prices were fixed for the entire project.'"

basis that the findings had no support in the evidence and did so apparently for the reason that they were based on inadmissible parol evidence, contravening the unambiguous terms of a written contract, or that the parties had *no contract at all*. Appellant's first two points attack this action of the trial court.

█ A trial court "may render judgment *non obstante veredicto* if a directed verdict would have been proper. . . ." Rule 301, T.R.C.P. To sustain the action of the trial court in granting a motion non obstante veredicto it must be determined that there is no evidence upon which the jury could have made the findings relied upon, *Douglass v. Panama, Inc.,* 504 S.W.2d 776, 777 (Tex.1974), or that the party in whose favor the motion was granted was entitled to a judgment as a matter of law. In reviewing a judgment notwithstanding the verdict on appeal it becomes a no evidence point, and all evidence must be considered in a light most favorable to the party against whom it was rendered and every reasonable intendment deducible from the evidence must be indulged in that party's favor. *Douglass v. Panama, Inc.,* supra; *Leyva v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547, 550 (1962); *Burt v. Lochausen,* 151 Tex. 289, 249 S.W.2d 194, 199 (1952).

Monesson maintains the trial court erred in rendering judgment non obstante in favor of Del-Mar because there is evidence to support the submission of each issue and the answers made thereto. From a review of the record we believe that the verdict of the jury is supported by ample evidence.

The Supreme Court said in *Lewis v. East Texas Finance Co.,* 136 Tex. 149, 146 S.W.2d 977, 980 (1941):

"If a written contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous. It follows that parol evidence is not admissible to render a contract ambiguous, which, on its face, is capable of being given a definite legal meaning. *This rule obtains even to the extent of prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of more than one legal meaning or construction."*

The rule is stated by Judge Calvert in *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951), thusly:

". . . a contract is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning. . . . In other words, if after applying established rules of interpretation to the contract it remains reasonably susceptible to more than one meaning it is ambiguous, but if only one reasonable meaning clearly emerges it is not ambiguous."

Also see *Varo, Inc., v. Kross,* 511 S.W.2d 719, 722 (Tex.Civ.App.—Eastland 1974, writ ref'd n. r. e.).

█ A contract must be considered and construed in its entirety, by its four corners, in attempting to determine the true intention of the parties. However, each clause or paragraph must be construed together with all other parts of the contract, but the intent of the parties concerning a particular matter may be determined from one sentence or paragraph only. 13 Tex.Jur.2d Contracts Sec. 113.

In *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 519 (Tex.1968), the court used the following language:

". . . Likewise, the Court will consider the characterizing circumstances that surround the execution of a contract and where the terms are still not clear the Court will hear oral testimony 'to ascertain the intent of the parties as expressed by the language used' [Quoting Williston] . . . [A]ll parts of the contract are to be taken together, and such meaning shall be given to them as will carry out and effectuate to the fullest extent the intention of the parties."

█ Applying the above rules of construction we are of the opinion that the

term "420 UNIT TOWNHOUSE PROJECT—CHIMNEY HILL" is susceptible of two interpretations: (1) did it specify the quantity of cabinets Del-Mar agreed to supply to Monesson for the project, or (2) did it only designate the particular project for which the cabinets were to be supplied? We believe, therefore, that the term was ambiguous and that it was appropriate and proper for the trial court to admit extrinsic evidence of the intention of the parties and to submit an issue to the jury for a finding thereon. The jury found that Monesson and Del-Mar mutually intended the contract was to cover the entire 420 units.

■ Additionally, we believe the language "Prices subject to change without notice" is susceptible to two interpretations: (1) did the provision apply only so long as the instrument was an unaccepted proposal, or (2) did it apply after acceptance by Monesson and was, therefore, effective through the contract? In considering the entire contract, we are of the opinion that the above quoted provision is ambiguous and, therefore, extrinsic evidence was admissible to show the intent of the parties or custom and usage in the industry or course of dealing. Texas Business and Commerce Code, Sec. 2.202; *Modine Manufacturing Co. v. North East Independent School District*, 503 S.W.2d 833, 837 (Tex.Civ.App.—Beaumont 1973, writ ref'd n. r. e.). It follows that we believe it was appropriate to submit the issue to the jury. *Trinity Universal Insurance Co. v. Ponsford Brothers*, 423 S.W.2d 571, 575 (Tex.1968).

Under Del-Mar's contention it could raise the prices of the cabinets to Monesson at its own discretion since the language "Prices subject to change without notice" was a part of the contract and is unambiguous. We disagree. In considering this provision together with all other provisions of the contract we believe it to be ambiguous.

■ Del-Mar furnished the form for the contract and typed in all the portions which were not printed on the form. The rule is that where ambiguity exists in a contract the agreement will be construed most strictly against the party who drafted it.

*Stowers v. Harper*, 376 S.W.2d 34, 41 (Tex. Civ.App.—Tyler 1964, writ ref'd n. r. e.); *Louisiana-Pacific Corp. v. Cain*, 519 S.W.2d 528, 529 (Tex.Civ.App.—Beaumont 1974, writ ref'd n. r. e.).

We sustain points one and two.

■ Appellant's third point of error contends that the trial court was in error in awarding attorney's fees to Del-Mar. The contention is that if Monesson is awarded his counterclaim for breach of contract, such will exceed the award of $18,167.09 to Del-Mar; hence, Del-Mar actually will not recover anything from Monesson and should not be awarded attorney's fee. The appellant cites Article 2226, V.A.T.S., establishing a statutory claim for attorney's fee in certain situations and cites cases holding that when an award of a counterclaim exceeds the original claim, Article 2226 is not applicable. However, in the present case attorney's fees are provided by contract. On the bottom portion of the proposal signed by both parties is stamped the following: "In the event it shall become necessary to place this contract in the hands of attorneys for collection or suit, the purchaser agrees to pay a reasonable attorney's fee and all costs incurred in the collection including any costs attendant to filing a mechanic's lien." It was necessary that Del-Mar initiate litigation in an attempt to collect payment for cabinets Monesson had not paid for, and Monesson had agreed to pay a reasonable attorney's fee in such event. Contrary to Monesson's contention Art. 2226, V.A.T.S., does not apply even though the jury found damages for Monesson's counterclaim in excess of the stipulated damages awarded to Del-Mar. Attorney's fees were payable under the terms of the contract, and $2,500.00 was a reasonable fee as stipulated. Point of error three is overruled.

The evidence in the record is undisputed (and the jury found) (1) that Monesson, at the time of trial, had suffered damages of $12,743.08 for increased cabinet costs paid as a result of the refusal of Del-Mar to ship all the cabinets for Phases 3 and 4 at the

prices in the contract; (2) that Monesson suffered damages of $3,266.40 for interest costs due to delays in closing sales of townhomes as a result of the refusal of Del-Mar to ship all of the cabinets for Phases 3 and 4 at the prices in the contract; and (3) that Monesson will suffer damages of $50,430.98 for the extra costs of cabinets which will have to be purchased to complete the Chimney Hill Townhome project as a result of the refusal of Del-Mar to ship all of the cabinets for Phases 3 and 4 at the prices in the contract.

The effect of our holding is that the trial court erred in failing to render judgment for Monesson on its counterclaim but the court was correct in its holding that Del-Mar should have judgment against Monesson for $20,667.09. Since the jury found damages for Monesson in the total sum of $66,440.46, that sum less $20,667.09, which Monesson owed Del-Mar, would be $45,-773.37. Therefore, the judgment of the trial court is reversed, and judgment is here rendered for Monesson in the sum of $45,-773.37.